[No. B212580. Second Dist., Div. Two. July 28, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
LELAND WONG, Defendant and Appellant.

1434

**COUNSEL**

Jonathan P. Milberg for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ASHMANN-GERST, J.**—The story of Leland Wong (Wong) is one of graft and hubris. Wrongly believing he could get away with lying, cheating and stealing, he ended up convicted of multiple crimes, including embezzling money (Pen. Code, § 487, subd. (a)),[1] accepting a bribe (§ 68), acting with a conflict of interest (Gov. Code, § 1090), and committing perjury (§ 118). He appeals and assigns error on the theory that the embezzlement convictions are barred by the statute of limitations, and the bribery, conflict of interest and perjury convictions are not supported by sufficient evidence. Among other questions presented by this appeal is the following: Is it legal for a commissioner in one city department to take money from a third party to influence contract negotiations with a different department in the same city? The answer is no. After review, we conclude that the challenged convictions must stand.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTS[2]

*Embezzlement from Kaiser Foundation Health Plan*

Kaiser Foundation Health Plan (Kaiser) operated as a nonprofit entity. For 17 years, Wong worked for Kaiser as the Southern California director of community and government relations. He had an annual budget of about $9 million, and his job was to promote Kaiser's profile in the community, which he did by taking community leaders to business meals and providing them with tickets to sporting events and concerts. Under Kaiser's code of conduct, Wong was prohibited from reselling Kaiser property and keeping the proceeds for himself. And per Kaiser's national policy, massages were listed as a prohibited business expense. From 1997 to 2002, Wong reported to Kathleen Ann Blackburn (Blackburn), the vice-president of public affairs for Kaiser's California Division. Beginning in 2000, Wong also reported to Richard Cordova (Cordova), the president of Kaiser's Southern California region.

Debra Hernandez (Hernandez) worked under Wong as manager of community relations, and Pat Schreuder (Schreuder) worked under Hernandez as an administrative assistant. Wong directed Hernandez and Schreuder to purchase tickets for him on their corporate credit cards. Afterwards, he resold the tickets to a friend named Wanda Denson-Low and others, took the proceeds and deposited them into his bank account at Bank of America.[3] Wong's fund disbursement authority was no more than $50,000. When he purchased expensive tickets that exceeded his fund disbursement authority, he split the invoice by dividing the cost into multiple expenses so that he would not have to obtain approval from a supervisor. Also, Wong paid for massages at the Bonaventure Club for himself and Troy Edwards (Edwards), a deputy mayor of the City of Los Angeles (City), and one of the massages received by Edwards included a sexual act. Wong was reimbursed by Kaiser for the massages.

In violation of Kaiser policy but at the request of Cordova, Kaiser's chief compliance officer Daniel Garcia, and possibly Blackburn, Wong organized fundraisers for California Assemblywoman Wilma Chan, labor leader Miguel Contreras, and City Attorney Rockard J. Delgadillo.

---

[2] We treat Wong's representations regarding the facts as factual concessions and, in part, base our statement of facts on those concessions. (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 506, fn. 1 [94 Cal.Rptr.3d 1, 207 P.3d 506].)

[3] Wong concedes that he kept proceeds from the ticket sales. He contends that it was $20,000 to $30,000.

Lori Dutcher (Dutcher) was the vice-president of compliance and was responsible for implementing programs to ensure that Kaiser and its employees were abiding by state and federal law. In October 2003, she received an anonymous tip that Wong had engaged in misconduct with respect to invoices paid to an organization called People Works. Dutcher[4] requested financial documents from Kaiser's controller and immediately began interviewing Kaiser employees. Although she was unable to substantiate any misconduct regarding the People Works invoices, she learned of other potential misconduct attributable to Wong. She expanded her investigation and asked Kaiser's finance department to run a report on all payments that had been made out of cost centers under Wong's control. When reviewing the documents, Dutcher noticed a number of suspicious expenses and determined three things: Wong violated Kaiser policy by having subordinates instead of Cordova sign many of his expense reports; he incurred expenses for a large number of events and meals that appeared to go beyond what was covered in Kaiser's travel and entertainment policies; and, finally, he used Kaiser assets for political events, which jeopardized Kaiser's nonprofit status.

Dutcher prepared a report to inform Kaiser management of her preliminary findings regarding inappropriate expenses, political events and the People Works invoices. Wong was placed on administrative leave and the documents in his office were secured. When Dutcher reviewed those documents, she discovered ticket purchases for Lakers games as well as for concerts by artists such as Paul McCartney and Madonna. The tickets were purchased from STAPLES Center, ticket agents and a lawyer named Ted Stein (Stein).[5] In contravention of Kaiser policy, there was no accounting system for the tickets, and Wong's staff could not tell Dutcher where the tickets went.

In January 2004, Wong was fired. The continuing investigation by Kaiser and the Los Angeles County District Attorney's Office led to the discovery that Wong sold Lakers tickets and kept the proceeds.

*Bribery, conflict of interest and perjury related to the Evergreen Group*

From 2001 to 2003, the City had three proprietary departments: the Los Angeles World Airports (LAWA), the Department of Water and Power

---

[4] Dutcher was aided in her investigation by others. Because their identities are not material, their names will not be mentioned. Some references to Dutcher operate as references to her investigative team.

[5] The People aver that Wong purchased $300,000 worth of tickets from Stein with Kaiser's money.

(DWP), and the Harbor Department (Harbor). Each department was self-supporting and overseen by a commission. LAWA was in charge of Los Angeles International Airport (LAX), Ontario International Airport (Ontario Airport), Palmdale Regional Airport and Van Nuys General Aviation Airport. The City's mayor, James Hahn (Mayor Hahn), had managerial authority over the City's proprietary departments and could appoint and remove members from their commissions at will. Though a commissioner was expected to exercise independent judgment on matters pending in his or her respective department, each commissioner was also expected to cooperate with the City's other departments, implement Mayor Hahn's policies, and take action on any issue that Mayor Hahn asked a department to address.

Due to congestion at LAX, Mayor Hahn wanted to move some of the air traffic from LAX to Ontario Airport. Mayor Hahn communicated his desire to LAWA through a variety of people that included Edwards, the liaison between the Mayor's office, the LAWA Commission and LAWA staff. Mayor Hahn was willing to offer carriers economic incentives to move away from LAX. In 2002, he appointed Wong to the LAWA Commission. In his capacity as a commissioner, Wong worked with Edwards on encouraging carriers to move their air traffic.

The Evergreen Group (Evergreen) was a large Chinese conglomerate with many companies. Two of those companies were EVA Air, an airline company with a lease at LAX, and Evergreen Marine Corporation (Evergreen Marine), an ocean shipping operation with a 30-year lease known as "Permit 888" at the Port of Los Angeles (Port).[6] Evergreen Marine believed its rent was too high and unsuccessfully tried to renegotiate with the Harbor Commission and Mayor Hahn for more advantageous terms.

Robert T. Chiu (Chiu) worked for Marine Terminal Corporation (Marine Terminal),[7] a vendor that provided stevedoring services to Evergreen Marine. Chiu knew Wong from the time Wong was the president of the Harbor Commission in the 1990's. Wong said he might be able to help with Permit 888, so Chiu put him in touch with Ren Gung Shyu (Shyu), an executive at Evergreen Marine. Shyu and Wong met in mid-2002 and Wong agreed to work as a consultant for $5,000 a month. Evergreen Marine hoped that Wong would act as a coordinator and "open up some channel[s]" so that the Port Authority and Harbor Commission would treat Evergreen Marine fairly with respect to rent. Shyu began depositing $5,000 a month into Wong's bank account in Hong Kong. Wong never asked the City whether working for Evergreen was a conflict of interest.

---

[6] Evergreen was founded by Y.F. Chang. Evergreen Marine and EVA Air were publicly traded companies in Taiwan and Y.F. Chang's family was the largest shareholder of each one.

[7] Marine Terminal is now an entity called Ports America.

Shyu provided Chiu and Wong with a draft of proposals for negotiating with the City, including a proposal that the City provide Evergreen Marine with a $3 million construction credit. In an e-mail to Edwards, Wong outlined Evergreen Marine's proposals and stated: "The following is a summary of items you should raise with the Port of LA on the Evergreen matter. The items listed have been raised by Evergreen and are very reasonable based on my experience and very standard in most contracts executed by the Port. Please note that there is preliminary approval to have EVA Airlines operate cargo and passenger service at Ontario. Please review and let me know what you think our strategy should be on Oct[ober] 30th. I believe the items requested are reasonable. We should also note that moving airline service to Ontario is a major accomplishment for the Mayor and should not be taken lightly. We also must be responsive to Evergreen's issues. Currently, Evergreen is paying more than $10 Million annually for higher land rental and extra operations cost due to inefficient operation at the Port of LA. This puts them at a major competitive disadvantage." In order to increase Evergreen Marine's room for negotiation with the City, Wong's e-mail to Edwards inflated the request for a construction credit by $500,000. Wong forwarded a copy of his e-mail to Edwards to Chiu, who forwarded the e-mail on to Shyu.

In November 2002, a group of City officials that included Mayor Hahn, Edwards, Wong and Larry Keller (Keller), the executive director of the Port, traveled to Asia. Keller and a negotiating team met with executives from Evergreen at its offices in Taipei to discuss Permit 888. Wong repeatedly spoke to Edwards during the trip and pushed him on ways the City could reach an agreement, and Edwards believed he was working with Wong in his official capacity as a LAWA commissioner. The City's team left Taipei without a deal and went to Tokyo.

Wong faxed Edwards a letter, stating: "Troy: We need to make a decision regarding Evergreen. This situation has not been handled well. Evergreen has responded to our request to sign off on a LOI (Letter of Intent) to relocate cargo to Ontario, and we have misled them on our actions. [¶] I received another call from [Shyu] this morning. I am embarrassed for you and for me. Our reputation will be tarnished. You may not be concern[ed] with that, but I am. You need to make a decision today re Evergreen! . . . [¶] This matter has elevated to Chairman Chang and currently, we all have egg on our faces. Don't leave me out to hang on this one! You have to provide some direction to [Keller]. The City/Port has been disrespectful and [has] not handled this matter well. [¶] We can't string this out any further. It is Friday and you can't expect people to wait for you to make a decision. [¶] Focus on this matter, please[,] and let's get it done. I have worked so hard on this for you [and] the mayor. You asked me to bring a major airline to Ontario and I have put my reputation on [the] line here."

Edwards spoke to Keller and said Evergreen was unhappy. Further, Edwards said that amending Permit 888 was important because it was tied to EVA Air's proposed move to Ontario Airport. He told Keller that there was a plane leaving in an hour and a half for Taipei, that Keller should pack and be on it, and that he should not come back without a deal. Edwards said he did not want Mayor Hahn to be embarrassed. Keller did exactly as he was instructed, which resulted in Evergreen and the City signing a memorandum of understanding regarding the terms of an amendment to Permit 888 for Evergreen Marine.

The proposed amendment to Permit 888 negotiated by Keller was never approved by the Harbor Commission or the city council. EVA Air signed a letter of intent with LAWA to relocate its air cargo operations to Ontario Airport but the move never happened. Meanwhile, while he was a LAWA commissioner, and while he was receiving compensation from Evergreen, Wong voted on a routine extension of EVA Air's lease at LAX. The extension was unanimously approved, along with lease extensions for 28 other airlines.

In March 2003, Wong resigned from the LAWA Commission after he was appointed to serve as a commissioner at the DWP. He asked to keep his badge and a LAWA Commission business card so he could continue representing Mayor Hahn's office in Asian affairs. Edwards approved Wong's request. The DWP wanted to reduce pollution in the Port as part of its Alternative Maritime Power program (AMP) and implement environmental restrictions, so it had an interest in the ongoing negotiations between Evergreen and the City. On April 30, 2003, Wong sent an e-mail to Edwards stating that "[w]e are going to have a very difficult time moving [Evergreen] to cooperate with us on the Ontario Cargo deal and retrofitting their Ships for AMP," due to the City's backpedaling. Wong averred that "Evergreen now feels all the actions from the [Port] [are] punitive and that the Mayor's office has no control over direction at the Port. [Keller] needs to contact [Shyu] today to explain in detail . . . the revised [memorandum of understanding] and how this will benefit Evergreen in [the] long run." In conclusion, Wong stated: "This is too much when you think about it, this looks like the Port is looking at every which way to [lose] Evergreen or to push them to divert cargo to Long Beach." On May 5, 2003, Wong e-mailed Chiu to say that he had dinner with Edwards to voice Evergreen's concerns regarding the memorandum of understanding signed in November. Wong also stated: "I suggested to [Edwards] that in order to restore the credibility of [the Port] [that] either [Edwards himself or Keller] . . . write a side letter to Evergreen reconfirming the commercial terms that [were] agreed [to] in the [memorandum of understanding]. In addition, the empty credit that was promised in the [memorandum of understanding] should be in effect . . . ASAP and retro back from Jan[uary] 1, 2002. [Edwards] promised to work on these two requests. I

will have another dinner meeting with [Keller] and [Edwards] on next Monday to follow up on this issue."

In August 2003, Permit 888 was amended.

Like other City officials, Wong filed an annual "Form 700," a financial disclosure form. Wong's 2002 Form 700 disclosed that he was receiving between $10,000 and $100,000 from Evergreen Marine. His 2003 Form 700 did not disclose Evergreen Marine's payments. Both forms were signed under penalty of perjury. The $5,000 monthly payments to Wong, which totaled $100,000, ceased as soon as he left public office in January 2004.

### Other actions by Wong

The W.H. Smith Company (W.H. Smith) was a concessionaire with an airport lease. The president of W.H. Smith sent an e-mail to Wong asking him to locate moneymaking opportunities and business deals profitable to both W.H. Smith and Wong. In December 2002, Wong voted to renew W.H. Smith's lease based on the recommendation of LAWA staff.

When Wong filed his California tax returns, he reported $12,000 in consulting fees in 2002 and $20,000 in 2003. He did not report any income over those amounts that he received from Evergreen Marine.

### The charges

Wong was indicted on August 22, 2006.

In count 1 of the consolidated and amended indictment and information, the People alleged that Wong accepted a $100,000 bribe from Shyu in violation of section 68. With respect to counts 2 and 3, it was alleged that Wong had a conflict of interest in violation of Government Code section 1090 when, in his official capacity, he became financially interested in and amended Permit 888 and extended EVA Air's lease. Count 4 alleged that Wong committed perjury on his 2003 Form 700 in violation of section 118. Pursuant to section 487, subdivision (a), counts 5, 6, 7, 8, 9, 10, 11 and 12 alleged that Wong committed embezzlement by selling Kaiser's property (Lakers tickets) on April 13, 2000, May 20, 2000, June 2, 2000, June 4, 2000, June 6, 2001, January 5, 2001, January 13, 2002, and February 1, 2003. Counts 13, 14, 15, 16 and 17 also charged Wong with embezzlement; they pertained to massages that Wong purchased for himself and others and claimed as a Kaiser expense. As to the embezzlement counts, the People alleged that the crimes were not discovered and could not have been discovered until Dutcher began investigating Wong in October 2003. In

counts 18, 19 and 20, Wong was charged with filing false tax returns in violation of Revenue and Taxation Code section 19705. Lastly, count 21 alleged that Wong had a conflict of interest in violation of Government Code section 1090 when, while serving as a LAWA commissioner, he voted to renew the airport lease LAWA had entered into with W.H. Smith.

### The verdict; sentencing

Following a jury trial, Wong was found guilty with respect to counts 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 18, 19 and 20. He was acquitted with respect to the embezzlement charges set forth in counts 7, 13, 14, 15, 16 and 17, and also as to the conflict of interest charge in count 21.

The trial court sentenced Wong to confinement in state prison for a total of five years. This timely appeal followed.

## STANDARD OF REVIEW

When a defendant challenges the sufficiency of the evidence to support a conviction, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].) We resolve all conflicts in the evidence and questions of credibility in favor of the verdict, and we indulge every reasonable inference the jury could draw from the evidence. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358 [43 Cal.Rptr.2d 135].)

In addition, the substantial evidence test applies when we are asked to review the record to determine whether a jury properly found, by a preponderance of the evidence, that a criminal proceeding is timely under the statute of limitations. (*People v. Le* (2000) 82 Cal.App.4th 1352, 1361 [98 Cal.Rptr.2d 874].)

## DISCUSSION

### I. The embezzlement convictions.

■ Wong contends that the embezzlement counts are time-barred because he was indicted more than four years after his offenses should have been discovered. (§§ 801.5, 803, subd. (c); *People v. Bell* (1996) 45 Cal.App.4th 1030, 1061–1062 [53 Cal.Rptr.2d 156] ["[T]he time limitation does not begin to run until the discovery of the offense. For the purpose of the subdivision,

an offense is discovered when either the victim or law enforcement learns of facts which, when investigated with reasonable diligence, would make the person aware a crime had occurred."]; *People v. Zamora* (1976) 18 Cal.3d 538, 571–572 [134 Cal.Rptr. 784, 557 P.2d 75] ["The crucial determination is whether law enforcement authorities or the victim had actual notice *of circumstances sufficient to make them suspicious of fraud thereby leading them to make inquiries which might have revealed the fraud.*"].)

■ We are told by Wong that if a defendant embezzles from a private entity, any subordinate employee qualifies as a victim who can be charged with notice. The People take a narrower view. Relying on cases involving fiscal crimes against governmental entities, the People contend that notice inquiry focuses solely on the knowledge of supervisors who oversee fiscal affairs. (*People v. Lopez* (1997) 52 Cal.App.4th 233, 247–248 [60 Cal.Rptr.2d 511] (*Lopez*); *People v. Moore* (2009) 176 Cal.App.4th 687, 695 [97 Cal.Rptr.3d 844].) After being confronted with this dispute, we were enlightened by the fact that *Lopez* relied on a case involving a victim who was a private individual, *People v. Kronemyer* (1987) 189 Cal.App.3d 314 [234 Cal.Rptr. 442] (*Kronemyer*). *Kronemyer* held: "Insofar as a thief is entitled to the benefits of a discovery statute, we believe it should extend no further than those persons who are direct victims, persons having a legal duty to report and investigate crime, and those persons who are clothed with a status imposed by law as guardian, conservator or equivalent, in the absence of express statutory direction." (*Id.* at pp. 334–335.) After parsing *Kronemyer*'s holding, *Lopez* stated that "the same rules should apply to crimes involving misappropriation of public funds and perjury in the execution of official documents relating to public funds. We hold therefore that in cases involving fiscal crimes against government, a victim for purposes of the discovery provisions of [section 803, subdivision (c)], is a public employee occupying a supervisorial position who has the responsibility to oversee the fiscal affairs of the governmental entity and thus has a legal duty to report a suspected crime to law enforcement authorities." (*Lopez, supra*, 52 Cal.App.4th at pp. 247–248.) In our view, precedent establishes that the rule of *Lopez* applies to public and private victims.

■ Our focus dwells upon when any Kaiser supervisor with fiscal oversight should have discovered that Wong sold Lakers tickets purchased with Kaiser funds and kept the proceeds for himself. It is undisputed that Wong had an annual budget of approximately $9 million and considerable autonomy, including the discretion to give tickets to community leaders. Also, the evidence establishes that he hid any hint of his spending on Lakers tickets from his supervisors, Blackburn and Cordova, by having subordinates purchase the tickets on their corporate credit cards, having subordinates sign his expense reports, and splitting invoices to avoid going over his fund disbursement authority limit. He did not have an accounting system for the tickets,

and his staff did not know where the tickets went. Even if Blackburn or Cordova knew Wong was purchasing tickets, there was no evidence to make them suspect embezzlement. He worked for Kaiser for 17 years and occupied a position of trust and responsibility. Blackburn testified that she was not aware of any of Wong's nefarious activities.[8] We conclude that these facts constitute substantial evidence that neither Blackburn nor Cordova learned of suspicious facts that required investigation. It was not until Dutcher received an anonymous tip about Wong in October 2003 and subsequently learned of his lavish spending on unaccounted-for Lakers tickets that Kaiser was on notice.

A contrary conclusion is advocated by Wong. He suggests that Kaiser had knowledge of circumstances that would have made any reasonable person suspicious that something was amiss in 2000, 2001 and early 2002 because he was purchasing massages at the Bonaventure Club and ordering his subordinates to charge those massages on their credit cards; he was purchasing large numbers of sports tickets, giving many of them to undisclosed recipients, and directing his subordinates to sign his expense reports in violation of Kaiser policy; and he was expending Kaiser funds to arrange illegal fundraisers for prominent politicians.

The problem for Wong is that while there is evidence that Schreuder and Hernandez were aware of enough information to suspect him of wrongdoing with respect to Lakers tickets, they were not victims under *Lopez*. And Wong did not cite any evidence to support his assertion that Blackburn and Cordova knew tickets were being given to undisclosed recipients.[9] As for the fundraisers, Wong was told to sponsor them and those events therefore did not give Blackburn or Cordova reason to suspect him of embezzlement.

---

[8] Blackburn testified that she reviewed Wong's expense reports, sometimes on a monthly basis. She was unaware that he was using Kaiser funds to buy himself massages, or that he directed Schreuder and Hernandez to charge massages to their credit cards and report them as their own expenses. Further, Blackburn testified that she was unaware that Wong was purchasing season tickets to STAPLES Center; signing licensing agreements with STAPLES Center; and selling tickets owned by Kaiser to third parties. She also did not know that Wong was purchasing tickets from Stein. Blackburn never suspected Wong of theft while she supervised him. At times she received a copy of Wong's calendar, but that was infrequent. She denied having a general understanding of what he did with his time.

[9] Wong contends that Blackburn "testified that she reviewed his expense reports and noted the unusual payments for massages at the Bonaventure Spa, as well as the large numbers of sports tickets purchased. She nonetheless approved these expenditures because they were not 'necessarily inappropriate.' She never questioned [Wong] concerning them." Wong did not cite to any specific pages in the reporter's transcript to support his assertions. Rather, he cited to pages "3007 et seq." Presumably, he was requesting that we read from page 3007 to the end of the reporter's transcript at page 5400 to validate his position. We decline. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 [75 Cal.Rptr.2d 27] ["As a general rule, 'The reviewing court is not required to make an independent, unassisted study of the record in

■ In the alternative, Wong contends that Kaiser should be charged with notice of his crimes because Cordova was in a position to review the expenditures of the employees that he supervised. There is no merit to this contention. The law does not require an employer to investigate an employee absent circumstances that are sufficient to make the employer suspicious of a crime.

We conclude that substantial evidence supports the jury's finding that the embezzlement charges were timely.

## II. *The Evergreen bribery charge.*

According to Wong, there was no evidence that he accepted a bribe, that Evergreen offered a bribe or that Evergreen acted with corrupt intent. We see the facts and the law differently.

■ "Every executive or ministerial officer, employee, or appointee of the State of California, a county or city therein . . . who asks, receives, or agrees to receive, any bribe, upon any agreement or understanding that his or her vote, opinion, or action upon any matter then pending, or that may be brought before him or her in his or her official capacity, shall be influenced thereby, is punishable by imprisonment in the state prison for two, three, or four years . . . ." (§ 68, subd. (a).) "The word 'bribe' signifies anything of value or advantage, present or prospective, or any promise or undertaking to give any, asked, given, or accepted, with a corrupt intent to influence, unlawfully, the person to whom it is given, in his or her action, vote, or opinion, in any public or official capacity." (§ 7, subd. 6.) We previously held that to convict a defendant of bribery, a jury need only find that "there existed subjects of potential action by the recipient, and that the bribe was given or received with the intent that some such action be influenced." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 929 [97 Cal.Rptr.2d 392]; see *id.* at p. 928, fn. 9 [applying § 165 but noting that bribery statutes "merit a like construction"].)

There is no dispute that Shyu gave Wong something of value for purposes of section 68 by paying him $100,000. Nor is there a dispute that Wong held

search of error or grounds to support the judgment.' [Citations.] It is the duty of counsel to refer the reviewing court to the portion of the record which supports appellant's contentions on appeal. [Citation.] If no citation 'is furnished on a particular point, the court may treat it as waived.' [Citation.]"].) In any event, we note that Blackburn testified that she did not know about any massage expenditures at the time she was supervising Wong, and that while she approved, for example, an expense at Sakura Health Gym and Sauna, she did not know it was a massage facility.

public office when he served as a LAWA commissioner and DWP commissioner at the time he was receiving $5,000 a month. The reasonable inference is that Shyu paid Wong to influence his actions in his official capacity because Evergreen Marine wanted to renegotiate Permit 888, Wong said he could help and, in the guise of trying to facilitate the move of EVA Air to Ontario Airport, he repeatedly pressured Edwards to reach a deal on amending Permit 888. Corrupt intent can be inferred from Shyu's agreement to pay money to Wong as well as Shyu's knowledge that while he was paying Wong, Wong used his public office to influence the actions of Edwards, Keller and other City officials. In addition, corrupt intent can be inferred from the clandestine payment of funds into a Hong Kong bank account, Wong's failure to disclose his relationship with Evergreen to City officials, Wong's request to keep his LAWA credentials after he was appointed to the DWP Commission, and the cessation of payments to Wong as soon as he left public office in January 2004. Finally, the facts demonstrate that Wong's public office as LAWA commissioner and DWP commissioner gave him the ear of Edwards and other City officials and, at the time of the first payment and the subsequent payments, there existed subjects of potential action by Wong, i.e., the opportunity to approach City officials and pressure them to amend Permit 888 under the cloak of working only for, and in the best interests of, the City.

■ Underlying Wong's challenge to his bribery conviction is the belief that a commissioner in one department of a local government can secretly work as a consultant for a third party with respect to its contract negotiations with a different department of the same local government. He relies on the City of Los Angeles Governmental Ethics Ordinance in the Los Angeles Municipal Code (LAMC) at section 49.5.1 et seq., but it offers him no reprieve. The evidence shows that he violated LAMC section 49.5.5 and section 49.5.11, subdivision J. LAMC section 49.5.5 prohibits a city official from using his or her office to induce any person to provide the city official with anything of value. LAMC section 49.5.11, subdivision J provides: "No member of a board or commission of the City shall, for compensation, communicate directly, either personally or through his or her agent(s) at the member's behest, with any City official for the purposes of attempting to influence action on municipal legislation on behalf of any other person." Municipal legislation means any legislative or administrative matter proposed or pending before an agency. (LAMC, § 48.02.) Wong was a public official who induced Evergreen Marine to pay him, and he was a commissioner who received compensation to influence action on a pending administrative matter, i.e., the negotiation with Evergreen regarding an amendment to Permit 888.

Wong suggests that LAMC section 49.5.11, subdivision D applies. It provides: "For one year after leaving City service, no other former elected

City officer, member of the City Ethics Commission or other former high level official shall, for compensation, engage in direct communication with any agency for the purpose of attempting to influence any action or decision on any matter pending before an agency on behalf of any person other than an agency." (LAMC, § 49.5.11, subd. D.) According to Wong, this subdivision applies because his lobbying activities in 2002 and 2003 occurred more than four years after he left the Harbor Commission. We cannot subscribe to this reasoning. This subdivision does not apply because he did not leave City service until 2004.

Regarding the issue of corrupt intent, Wong contends that both Shyu and he believed in good faith that he could consult with Evergreen Marine because he had not been on the Harbor Commission for four years. In Wong's view, his good faith is evident because he reported his compensation from Evergreen Marine on his 2002 Form 700. He also contends that he made no secret of his connection with Evergreen in arranging various meetings and urging City officials to consider Evergreen's proposals for amending Permit 888. But he failed to cite any evidence that he told Edwards, Keller, Mayor Hahn or any other City official of his relationship with Evergreen.[10] Moreover, we note that in his e-mail to Edwards regarding Evergreen's proposals, Wong asked Edwards about what he thought "our strategy" should be, meaning the City's strategy. In his fax to Edwards during the Asia trip, Wong specifically stated: "I have worked so hard on this matter for you [and] the mayor. You asked me to bring a major airline to Ontario and I have put my reputation on [the] line here." These communications with Edwards are just two examples establishing that while Wong was working as an advocate for Evergreen, he masqueraded as an advocate for the interests of Edwards, Mayor Hahn and the City.

III. *The Evergreen conflict of interest convictions.*

In attacking his convictions for conflict of interest in connection with the proposed amendment of Permit 888 for Evergreen Marine, Wong posits that we must reverse because there was no contract for purposes of Government Code section 1090, nor did he have a financial interest in a contract. As for

---

[10] According to Keller, he spoke to Wong sometime in 2002 or 2003. Wong said that he intended to be a consultant for "port clients" including Evergreen Marine. When Keller expressed concern that Wong would have a conflict of interest, Wong said he was still mulling the matter over and had not made up his mind. Later, Wong told Keller he was not going to become a consultant, but if he decided to assist Evergreen, it probably would not be for compensation. This is the only evidence cited by Wong that he revealed his consulting to City officials.

the conviction arising from the EVA Air lease extension, Wong contends that his financial interest was nonexistent or so remote that he cannot be held criminally liable.

We disagree.

██ Government Code section 1090 provides: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." This statute represents the Legislature's decision to codify the common law rule prohibiting public officials from having a personal financial interest in the contracts they form in their official capacities. (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1073 [103 Cal.Rptr.3d 767, 222 P.3d 214] (*Lexin*).) "The evil to be thwarted by [Government Code] section 1090 is easily identified: If a public official is pulled in one direction by his financial interest and in another direction by his official duties, his judgment cannot and should not be trusted, even if he attempts impartiality." (*Carson Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1330 [44 Cal.Rptr.3d 881] (*Carson*).) Government Code section 1090 applies when a public official has a direct financial interest in a contract. And "[e]ven when a public official's financial interest is indirect, [Government Code] section 1090 will still apply unless the interest is too remote and speculative. [Citation.]" (*Carson, supra*, at p. 1330.) As long as a contract is directly or indirectly the result of a conflict of interest, the contractual terms are irrelevant and the courts will not inquire into whether the public suffered a loss. (*People v. Honig* (1996) 48 Cal.App.4th 289, 314 [55 Cal.Rptr.2d 555] (*Honig*) ["criminal responsibility is assessed without regard to whether the contract in question is fair or oppressive"].)

██ A contract is made by a public official for purposes of Government Code section 1090 if he "had the opportunity to, and did, influence execution [of the contract] directly or indirectly to promote his personal interests. [Citation.]" (*People v. Sobel* (1974) 40 Cal.App.3d 1046, 1052 [115 Cal.Rptr. 532] [decisional law has not interpreted Gov. Code, § 1090 "in a hypertechnical manner"].) By construing the word "made" in Government Code section 1090 to encompass preliminary discussions, the law casts a broad net over official conduct that might influence a public contract. (*People v. Sobel, supra*, at p. 1052.) Thus, a public official can violate Government Code section 1090 even though he did not participate in the contract's execution. (*People v. Sobel, supra*, at p. 1052.)

██ A public officer need not acquire an interest in a contract (as in the case of self-dealing) or share in the contract's profits to come within the

Government Code section 1090 proscription. (*Honig, supra*, 48 Cal.App.4th at p. 315.) Government Code section 1090 targets any interest which would prevent a public official from exercising absolute loyalty and undivided allegiance to the governmental entity he or she serves. (*Honig, supra*, at p. 315.) Even if a public official makes a contract in which his interest is small or indirect, a crime is established so long as the interest " 'is such as deprives the [state] of his overriding fidelity to it and places him in the compromising situation where, in the exercise of his official judgment or discretion, he may be influenced by personal considerations rather than the public good.' [Citation.]" (*Ibid.*) Labels and titles and fictional divides that create illusory separation between a public official, a clandestine benefactor and a source of income or other benefit must be ignored. Instead, we must " 'look behind the veil which enshrouds [the] activities [of public officials and their clandestine benefactors] in order to discern the vital facts. [Citation.] However devious and winding the trail may be which connects the officer with the forbidden contract, if it can be followed and the connection made, a conflict of interest is established.' [Citation.]" (*Ibid.*)

The proposed amendment of Permit 888 negotiated by Keller was not approved, but Permit 888 was eventually amended. Wong pushed the City to negotiate with Evergreen while he was a LAWA commissioner and DWP commissioner. The evidence showed that in May 2003, only four months before Permit 888 was amended, he wrote an e-mail update of his lobbying activities to Chiu. There is a reasonable inference that Wong's participation in the preliminary discussions in 2002 and 2003 indirectly led to the Permit 888 being amended. Accordingly, there is substantial evidence that he "made" a contract in his official capacity. It does not matter if, as Wong contends, the 2003 amendment lacked the reduced rent Evergreen wanted. The policies set forth in *Lexin, Carson* and *Honig* are squarely implicated.

 Based on Wong's actions and communications, the evidence was sufficient to support a finding that he received $100,000 to influence the City's negotiations with Evergreen. And there is an inference that Wong would not have championed Evergreen's cause without remuneration. Thus, Wong was financially interested in the amendment to Permit 888. (*Carson, supra*, 140 Cal.App.4th 1323 [for purposes of Gov. Code, § 1090, a public official who obtains an extortion payment in exchange for approval of a public contract has an indirect financial interest].)

Turning to the conflict of interest conviction arising from the EVA Air lease extension, the sole point of contention is whether Wong had a financial interest. We easily conclude that he did.

As he concedes in his briefs, Wong voted on the extension and it was approved. He also concedes that he accepted $100,000 from Evergreen

Marine, which was part of Evergreen, the conglomerate that negotiated with the City for an amendment of Permit 888. It is easy to infer that Evergreen would have been none too pleased if a public official who was being bribed by one Evergreen company voted in a manner contrary to the interests of a second Evergreen company. Thus, Wong was placed in a compromising position when he voted on the extension. The trail has twists and turns, but it can be traced. We therefore conclude that Wong had a financial interest in the extension for purposes of Government Code section 1090.

IV. *The perjury conviction.*

Wong argues that the omission of his income from Evergreen on his 2003 Form 700 was not material and he therefore did not commit perjury. This nonsensical argument fails on its face.

Every person who willfully makes a false statement under oath is guilty of perjury if the statement is material. (§ 118, subd. (a).) An omission on a financial disclosure form is material "if there is a substantial likelihood that a reasonable person would consider it important in evaluating . . . whether a public official can perform the duties of office free from any bias caused by concern for the financial interests of the official or the official's supporters." (*People v. Hedgecock* (1990) 51 Cal.3d 395, 406–407 [272 Cal.Rptr. 803, 795 P.2d 1260] (*Hedgecock*) [affirming the convictions of a mayor for violating state and local disclosure laws and committing perjury based on errors and omissions by him in disclosure statements].)[11]

A public official's acceptance of a bribe is per se material because it demonstrates dishonesty and unfitness for public duty, and it undermines the integrity of public office. Wong accepted $5,000 a month for 20 months. His failure to report these payments on his 2003 Form 700 was perjury. In order to rewrite the story, Wong argues that his omission could not possibly have been material because Mayor Hahn's staff did not read the 2003 Form 700 and did not consider it when determining whether Wong could participate in the Evergreen negotiations or vote on matters involving EVA Air.[12] But the offense was complete once Wong signed the 2003 Form 700 and filed it. Section 118 does not require as an element of perjury that a declaration or certification under oath be read by a third party and relied upon.

---

[11] The parties agree that *Hedgecock* is controlling.

[12] According to the City, Wong's 2003 Form 700 was filed with LAWA and the City's ethics commission. Mayor Hahn's chief of staff testified that the mayor's office did not review these forms.

## DISPOSITION

The judgment is affirmed.

Doi Todd, Acting P. J., and Chavez, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 17, 2010, S186015. Werdegar, J., did not participate therein.