Filed 5/17/16  P. v. Turpin CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHN ROBERT TURPIN,<br><br>    Defendant and Appellant. | B260812<br><br>(Los Angeles County<br>Super. Ct. No. VA129083) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Higa, Judge.  Affirmed.

Christine C. Shaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

A jury convicted John Robert Turpin of two counts of forgery and one count of failing to file an income tax return. He appeals his forgery convictions, arguing insufficient evidence supports the jury's findings that the prosecution for those charges was commenced within the four-year statute of limitations applicable to the crime of forgery. He also argues the trial court's statute-of-limitations instruction was ambiguous and the court prejudicially erred by failing to clarify the instruction at the jury's request. We conclude substantial evidence supports the jury's findings and disagree that the court committed any instructional error. Accordingly, we affirm.

**BACKGROUND**

**1.      The Loan and Escrow Agreements**

Between 2002 and 2007, Kenneth Fuller, a real estate agent and broker, engaged in several real estate transactions with Turpin. Typically, Turpin would find and manage investment properties and Fuller would secure financing from lenders. In engaging in those transactions, Turpin would sometimes sign Fuller's name on documents without Fuller's permission. Although Turpin would usually later tell Fuller that he had signed Fuller's name, Fuller never expressly gave Turpin permission to sign his name. Nevertheless, Fuller trusted Turpin and considered Turpin to be his closest friend.

In 2007, Turpin wanted to purchase a property in Sunset Beach as part of a real estate project he was working on, so he asked Fuller to help him qualify for a loan. Howard Marans, another good friend of Turpin, agreed to lend Turpin and Fuller $1,000,000 as a down payment on the Sunset Beach property. However, Marans requested that Fuller be solely responsible for repaying the loan. As collateral for the loan, Fuller provided Marans a security interest in real estate he owned. As part of the agreement between Marans, Fuller, and Turpin, Fuller's name was to be listed as the buyer on the title for the Sunset Beach property. However, Fuller always viewed Turpin as the real buyer and manager of the project, and he believed that the escrow account with Escrow Legends was opened in Turpin's name.

2

In February and April 2008, Marans gave Turpin two checks— totaling $1,000,000—to be deposited in the escrow account. On June 3, 2008, Turpin instructed the escrow agent, Kelli Redding, to release $100,000 to the seller of the Sunset Beach property, David Fries. In a handwritten note, Turpin also instructed Redding to assign all rights and interests in the account to Fuller. The assignment required an amendment to escrow instructions, which required a signature from both Fries and Fuller. Fuller's signed name appeared on the document releasing $100,000 and amending the escrow instructions. However, Fuller did not sign the document or give Turpin permission to sign his name.

On June 21, 2008, Fries cancelled escrow and directed that the funds held in the escrow account be returned to the buyer, less any escrow fees. Turpin did not tell Marans or Fuller that Fries cancelled escrow. On July 18, 2008, Redding received a document, purportedly signed by Fuller, that cancelled escrow. Redding issued a check for $750,000, the balance of the escrow account, to Turpin. Fuller did not sign the document and did not give Turpin permission to sign his name.

Throughout the year, Turpin gave Marans and Fuller numerous excuses about why it was taking so long to close escrow, and he repeatedly assured them that the deal for the Sunset Beach property was still going forward. Redding often did not return Fuller's phone calls, and she never notified Fuller that Fries had cancelled escrow. Around January 7, 2009, Fuller heard a rumor that escrow had been cancelled. When he questioned Turpin about it, Turpin sent a falsified ledger from Escrow Legends showing the escrow account held a balance of $780,000. At that time, the actual balance of the account was zero.

On March 9, 2009, Fuller sent a fax to Redding instructing that no funds be distributed from the escrow account without him being present to sign the release authorization. On March 11, 2009, Turpin asked Fuller to meet him at a restaurant. Turpin told Fuller that he removed the money from the escrow account, all of which he had since spent. Turpin did not say how he had removed the money from the escrow account, but he begged Fuller not to go to the police.

3

The day after Turpin confessed to Fuller, Fuller began calling Redding to inquire about how the money could have been removed from the escrow account. When Redding would not return his phone calls, Fuller engaged his attorney who contacted the escrow agency. On March 17, 2009, Redding faxed a ledger to Fuller showing that the true account balance was zero. The ledger showed, among other transactions, that $100,000 was issued to Fries on June 3, 2008, and $750,000 was issued to Turpin on July 18, 2008. On April 18, 2012, a detective served a search warrant on Escrow Legends. An arrest warrant for Turpin was issued on March 14, 2013.

### 2. The Charges

Turpin was charged with grand theft of personal property (Pen. Code,[1] § 487, subd. (a); count 1), two counts of forgery (§ 470, subd. (a); counts 2 & 3), and failure to file income tax returns in 2008, 2009, and 2010 (Rev. and Tax. Code, § 19706; counts 4, 5 & 6).[2] It was further alleged as to counts 1, 2, and 3, that the crimes were not discovered within the meaning of section 803, subdivision (c), until March 11, 2009, that they were related felonies involving a taking of more than $500,000 (§ 186.11, subd. (a)), and that Turpin committed the offenses with intent to take, damage, and destroy property of a value exceeding $200,000 (§ 12022.6, subd. (a)(2)).

### 3. The Evidentiary Hearing on the Statute of Limitations

On July 17, 2014, Turpin filed a motion to dismiss counts 1, 2, and 3 as time-barred (§ 995). In his motion, Turpin requested that the court conduct a pre-trial evidentiary hearing to determine whether counts 1, 2, and 3 were brought within the applicable statutory periods. On, July 18 and 21, 2014, the court held an evidentiary hearing. The court dismissed count 1 as time-barred and denied the motion to dismiss as to counts 2 and 3, the forgery charges. On August 14, 2014, the People amended the information to allege the two counts of forgery were discovered on March 17, 2009.

---

[1] All undesignated statutory references are to the Penal Code.

[2] It appears that the People proceeded only with count 4, failure to file an income tax return in 2008. The record is silent as to when counts 5 and 6 were dismissed.

### 4.    The Trial, Verdicts, and Sentencing

Fuller testified as follows with respect to when he discovered Turpin had used his forged signatures to release funds from the escrow account. Although Fuller knew that Turpin had removed the funds from the escrow account as of March 11, 2009, he did not know how Turpin had done so until March 17, 2009, when he received the true ledger showing Turpin had forged Fuller's signature to release the funds. Prior to March 17, 2009, Turpin had never shown Fuller the true ledger, he had never discussed with Fuller the details about how he removed the funds from the escrow account, and Fuller had not been able to reach anyone at Escrow Legends to discuss the escrow account.

Before instructing the jury, the court took judicial notice of the fact that the prosecution for forgery against Turpin was initiated on March 14, 2009, when Turpin's arrest warrant for the forgery charges was issued. The court then instructed the jury using CALJIC No. 4.74:

> "This action was commenced on March 14, 2013. You may convict the defendant of forgery in violation of Penal Code section 470(a) only if the forgery was discovered within four years of the commencement of the action.
> "However, you may not convict the defendant of forgery if you find that in the exercise of reasonable diligence on the part of the alleged victim, the forgery would have been discovered at a time more than four years before the commencement of the action. The words [sic] 'discovered' as used in this instruction does not mean mere awareness of loss or misconduct, nor does it mean mere loss — [nor] does mere loss or misconduct in and of itself suggest a likelihood of forgery.
> " 'Discovered' means an awareness that there has been loss and/or misconduct and that it was caused by criminal means."

During closing arguments, the prosecutor argued that Turpin's forgeries were not discovered until March 17, 2009, when Fuller first received the real ledger containing his falsified signatures from June 3 and July 18, 2008. Turpin, on the other hand, argued that Fuller discovered the loss was accomplished by criminal means when Turpin confessed to the theft on March 11, 2009. Thus, he argued, the date of discovery under the statute of limitations was March 11, 2009. Since the prosecution was not

5

initiated until March 14, 2013, Turpin argued the statute of limitations had already expired and the two counts of forgery were time-barred.

The jury began deliberating on October 22, 2014. About two-and-a-half hours after beginning deliberations, the jury submitted the following question:

> Can the court give additional explanation to [CALJIC No.] 4.74. There is some confusion over "discovered loss or misconduct" versus "discovered forgery." Is it required to find guilty the discovery of "forgery," or just "loss or misconduct"?

After receiving the jury's question, the court conferred with the prosecutor and counsel for Turpin. Counsel for Turpin argued that discovery meant "just loss or misconduct." The prosecutor argued that loss or misconduct does not necessarily show the likelihood of forgery, and that the jury should consider the instruction as a whole. The court then called the jury into the courtroom. The court addressed the jury as follows: "We've consulted with the lawyers, and the answer I will give you is direct you back to [CALJIC No.] 4.74. . . . Read it as a whole. Read it as a whole. And we'll see where we are then."

On October 23, 2013, the jury convicted Turpin of both counts of forgery and one count of failing to file an income tax return. The jury also found true the excessive-taking allegations as to counts 2 and 3. Turpin was sentenced to five years and eight months in state prison.

## DISCUSSION

### 1. Substantial evidence supports the jury's findings

Turpin does not contest that he committed the forgeries on June 3 and July 18, 2008. Rather, he argues that Fuller discovered the forgeries on March 11, 2009, and that the prosecution was not commenced within the four-year statute of limitations under section 801.5. (See *People v. Price* (2007) 155 Cal.App.4th 987, 991-996 [section 801.5's four-year statute of limitations applies to prosecutions for forgery].) Specifically, Turpin contends that the prosecution produced insufficient evidence that the date of discovery of the forgeries under counts 2 and 3 was within four years of

6

March 14, 2013. As a result, Turpin argues, his convictions for forgery should be reversed.

At trial, the prosecution had the burden of proving, by a preponderance of the evidence, that the actions for forgery against Turpin were commenced within the four-year statute of limitations applicable to those crimes. (*People v. Castillo* (2008) 168 Cal.App.4th 364, 369 (*Castillo*); *People v. Zamora* (1976) 18 Cal.3d 538, 565, fn. 27.) Accordingly, the prosecution needed to prove that it commenced the forgery actions "within four years after discovery of the commission of the offense, or within four years after the completion of the offense, whichever is later." (§ 801.5; see also *People v. Lopez* (1997) 52 Cal.App.4th 233, 246 (*Lopez*) [the statute of limitations begins to run when the crime is discovered by either the victim or the responsible law enforcement authorities].) The statute of limitations does not begin to run until the discovery of the offense, which occurs when the offense is actually discovered by the victim or responsible law enforcement authorities, or those entities are aware of facts which, when investigated with reasonable diligence, would make someone aware a crime had occurred. (*People v. Wong* (2010) 186 Cal.App.4th 1433, 1444-1445.)

We review a jury's finding that a criminal prosecution was commenced within the statute of limitations for substantial evidence. (*Castillo*, *supra*, 168 Cal.App.4th at p. 369; see also *People v. Le* (2000) 82 Cal.App.4th 1352, 1361 [the substantial evidence test applies even when reviewing a jury's findings made under the preponderance of the evidence standard].) We resolve all conflicts in favor of the verdict and indulge every reasonable inference the jury could draw. (*People v. Autry* (1995) 37 Cal.App.4th 351, 358.) " ' "If the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

Here, the court took judicial notice of the fact that the criminal action against Turpin for the two counts of forgery was commenced on March 14, 2013. By

7

convicting Turpin of forgery, the jury implicitly found that Fuller did not discover the forgeries before March 14, 2009. Substantial evidence supports these findings.

Fuller testified that the first time he understood how the money in the escrow account had been withdrawn was when he saw the true ledger on March 17, 2009. Fuller also had no reason to know, prior to seeing the March 17, 2009 ledger, that Turpin had used Fuller's forged signatures to amend the escrow account. Fuller's March 9, 2009 instruction to Redding not to release any funds from the escrow account without his presence and signature is evidence that he still believed there was money in the account. Neither Redding nor Turpin informed Fuller that the account balance was actually zero or that escrow had been cancelled. In addition, nothing about Turpin's March 11, 2009 confession led Fuller to suspect the theft had been accomplished by forgery. Fuller believed the escrow account had been opened in Turpin's name, and he was not aware of any of the transactions Turpin and Fries had conducted with respect to the account in June and July 2008. While Fuller should have been aware by March 11, 2009 that Turpin had committed a theft in removing funds from the escrow account, he was not aware of any facts that would have put him on notice that the funds had been removed by means of forgery until he received the true ledger on March 17, 2009. (*Lopez*, *supra*, 52 Cal.App.4th at p. 246, fn. 4.)

In addition, Fuller was reasonably diligent in investigating the loss after March 11, 2009. The day after Turpin confessed to removing the money from the escrow account, Fuller began trying to contact Redding to find out how the funds could have been removed. Fuller also contacted his attorney and Marans shortly after his conversation with Turpin. Fuller testified that although he thought he might be the victim of a crime, he did not suspect Turpin had committed forgery to remove the funds until he received the true ledger on March 17, 2009. Based on this evidence, a reasonable trier of fact could conclude that the date of discovery was March 17, 2009, and that the prosecution therefore was commenced within the statutory period.

Turpin contends that the statute of limitations for the forgery charges began to run on March 11, 2009. He argues that when he confessed to the theft on March 11,

8

2009, Fuller "had solid facts sufficient to put a reasonably prudent person on inquiry as to the presence of fraud." (Internal quotations omitted.) He further argues that since fraud is an element of forgery, Fuller should be deemed to have "discovered" the forgeries upon learning of the theft.

"Discovery" for purposes of commencing the limitations period occurs when the victim discovers the loss was caused by the crime at issue. Section 803 proscribes that the limitation period "does not commence to run until the *discovery of an offense* described in this subdivision." (§ 803, subd. (c) [emphasis added].) Similarly, section 801.5 requires that the prosecution commence "within four years after discovery of the *commission of the offense*, or within four years after the *completion of the offense . . . .*" (§ 801.5 [emphasis added].) The statutory language indicates that it is the discovery of the specific offense—in this case, forgery—that commences the limitations period. (§ 801.5; see also *Lopez*, *supra*, 52 Cal.App.4th at p. 246, fn. 4 [it is the discovery of the crime (i.e., forgery) and not just a loss, that triggers the running of the statute of limitations]; see also *People v. Petronella* (2013) 218 Cal.App.4th 945, 956 (*Petronella*).) Here, the record supports the finding that Fuller did not discover the forgeries until March 17, 2009.

Turpin also asserts Fuller was suspicious that Turpin had been engaging in illegal conduct with respect to the escrow account long before March 17, 2009, and that upon hearing the rumor that escrow had been cancelled, Fuller could have discovered the forgeries through reasonable diligence. However, even if circumstances exist that may arouse suspicion in a reasonable victim, subsequent reassurances by the defendant to allay the victim's suspicion may operate to delay the discovery of the crime. (See *Garrett v. Perry* (1959) 53 Cal.2d 178, 181-182; see also *Hartong v. Partake, Inc.* (1968) 266 Cal.App.2d 942, 966; *Brownlee v. Vang* (1965) 235 Cal.App.2d 465, 476.) That is certainly the case here. Turpin repeatedly lied to both Marans and Fuller about the progress of the project. Even after Fries cancelled escrow, Turpin continued to claim he had saved the deal. When Fuller questioned Turpin about the rumor that escrow had been cancelled, Turpin falsified a ledger from Escrow Legends.

9

Furthermore, Redding would not return Fuller's calls, did not notify him that escrow had been cancelled, and did not contact Fuller after Turpin confessed to her. These factors delayed discovery and support the jury's conclusion that Fuller could not have discovered the forgeries earlier. After reviewing the record, we find there is sufficient evidence to support the jury's finding by a preponderance of the evidence.

### 2. The court did not err in addressing the jury's request for clarification of the statute-of-limitations instruction

Turpin next contends the court prejudicially erred in responding to the jury's request for clarification of the instruction. Turpin argues the jury's confusion about the instruction's language was compounded by the court's response that the jury should read the instruction as a whole. According to Turpin, the court should have clarified for the jury that "discovery" for purposes of triggering the statute of limitations occurs when the victim or law enforcement is aware that the loss was caused by general criminal misconduct, not the specific crime the defendant is charge with.

Although Turpin also asserts the language of the statute-of-limitations instruction provided by the court is ambiguous, he concedes in his opening brief that the language of the instruction complies with California law. In any event, we conclude the court properly instructed the jury on the statute of limitations for the forgery charges. "In reviewing a challenge to jury instructions, we must consider the instructions as a whole. [Citation.]" (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1294.) As explained above, it is the discovery of the charged crime, not just criminal misconduct, which triggers the running of the statute of limitations. (See § 801.5; see also *Lopez*, *supra*, 52 Cal.App.4th at p. 246, fn. 4; see also *Petronella*, *supra*, 218 Cal.App.4th at p. 956.) Therefore, it was proper for the court to insert "forgery" in the instruction's blank space reserved for the offense at issue when instructing the jury that to convict Turpin of forgery, the forgery must have been discovered within four years.

In addition, the trial court was not obligated to attempt to further clarify CALJIC No. 4.74 at the jury's request. Under section 1138, when jurors "desire to be informed on any point of law arising in the case," the court must provide them "the

information required." Section 1138 "imposes a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) This does not mean, however, that the court must always elaborate on the standard instructions. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) "Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky." (*Ibid*.) The court may decide to reiterate the instructions already given, if it believes doing so will help correct the jury's confusion. (*Ibid*.)

That is exactly what the court did here. Rather than attempting to expand on, or modify, the language of CALJIC No. 4.74, the court decided it was best to redirect the jury's attention to the instruction's language and provide guidance on how to read that language. Had the jurors required additional clarification after being instructed to consider CALJIC No. 4.74 as a whole, they could have requested such clarification. Indeed, the fact that the jury reached verdicts on both forgery counts less than one day after the court addressed its request for clarification demonstrates that the court's response to the jury's questions helped clarify the ambiguity that was troubling the jury. (See *People v. Yoder* (1979) 100 Cal.App.3d 333, 338 ["We must also assume that the jurors are intelligent persons and capable of understanding and correlating all the instructions which are given."]) Accordingly, we conclude the court did not err in responding to the jury's request for clarification.

11

## DISPOSITION

The judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



LAVIN, J.

WE CONCUR:



ALDRICH, Acting P. J.



HOGUE, J.*

---

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.