Filed 5/20/13  P. v. Heard CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D060921, D061687 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD221605) |
| JEREMY HEARD, | |
| Defendant and Appellant. | |

CONSOLIDATED APPEALS from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Affirmed as modified with directions.

Rex Williams, under appointment by the Court of Appeal, for Defendant and Appellant.  [*Appointed*.]

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Scott C. Taylor, Deputy Attorneys General for Plaintiff and Respondent.

Jeremy Heard appeals from a judgment convicting him of numerous counts of prohibited practice by a mortgage foreclosure consultant and forgery arising from his

operation of a company that purported to assist homeowners whose residences were in foreclosure. He argues the prohibited practice counts (based on his acquisition of an interest in the residences) must be reversed because (1) the statute of limitations had expired for these counts, and (2) the prosecution did not establish that the residences were still in foreclosure at the time he acquired an interest in them. He also argues the forgery counts must be reversed because (1) the evidence does not support that the charged misconduct constituted forgery, and (2) the trial court failed to instruct on aiding and abetting principles. Further, he challenges the trial court's award of victim restitution on the basis that one of the victims did not suffer economic loss. We reject his contentions of reversible error.

The Attorney General concedes, and we agree, that the minute order and abstract of judgment incorrectly refer to a parole revocation restitution fine that was unauthorized and not imposed by the court. Accordingly, we modify the minute order to strike the reference to this fine, and instruct the superior court to prepare an amended abstract of judgment reflecting this change.

As so modified, the judgment is affirmed.[1]

FACTUAL AND PROCEDURAL BACKGROUND

In the early 2000's, defendant formed a company called Good Samaritan Society (GSS or Good Samaritan) with a partner, James Cloud. Cloud, a real estate salesperson,

---

[1] Defendant has also filed a petition for writ of habeas corpus, which we have considered with the appeal. In an order filed separately from this opinion, we deny the habeas petition.

2

had worked with defendant in the real estate industry since 1988. According to Cloud, GSS was formed to help people whose residences were in foreclosure. The plan was to get residences out of foreclosure; place ownership of the residences in a trust account for three years; allow the homeowners time to rebuild and establish their credit; and then permit the homeowners to obtain a loan and reacquire their ownership of their home. To qualify for GSS's services, the residences had to be in foreclosure and have some equity value. To build a customer base, Cloud and defendant purchased a foreclosure list and mailed postcards advertising their services to homeowners on the list. The charges in the current case were based on transactions between defendant and seven homeowners who contracted with GSS in 2004 and 2005.

At trial, the prosecution's witnesses included Cloud, the homeowner/victims who contracted with GSS, and several "straw buyers" who were hired by defendant to participate in the transactions. The transactions were generally structured as follows.[2] The homeowners entered into a trust agreement with GSS and signed a grant deed transferring title to the residence to GSS. GSS then sold the property to a straw buyer who obtained a loan to buy the residence. After the straw buyer's loan was finalized, the straw buyer deeded the property back to GSS. To obtain the loan, the straw buyer submitted a residential purchase agreement and loan application to the bank indicating that he or she was buying the property from GSS. The straw buyer's loan was used to pay

---

[2]    There were some differences in the way some of the transactions were structured, but for purposes of resolving the issues on appeal we need not specify the variations.

off the homeowner's loan, and the portion of the straw buyer's loan derived from the equity in the home was disbursed through escrow to GSS as the seller.

The straw buyer's name remained on the loan even after the straw buyer transferred ownership of the property back to GSS. The straw buyers received $10,000 from GSS for their participation. The homeowner continued residing in the home, made monthly payments to GSS, and GSS in turn paid the monthly mortgage on the loan obtained by the straw buyer. Under the terms of a beneficiary agreement created with the trust agreement, GSS (or an affiliated company owned by defendant) was entitled to a percentage of the equity in the home upon the termination of the trust agreement.

Defendant used three GSS employees, and the father of a GSS employee, to act as straw buyers. According to the straw buyers, defendant made the decisions for GSS's operations and told them how to fill out the documents, including the residential purchase agreements and loan applications. The straw buyers were not experienced in real estate and they simply complied with defendant's directions.

To ensure that the straw buyers would qualify for the purchase loans, defendant had them engage in numerous fabrications on the loan applications, including falsely stating that they were going to occupy the residences; creating "dummy" corporations and stating they worked for these corporations; inflating their incomes; listing assets that they did not have; and falsely stating they had no business relationship with the seller (GSS). Defendant also gave money to the straw buyers to place in their bank accounts to show that they had sufficient assets, which the straw buyers gave back to defendant after the loan closed.

4

To sell GSS's services to interested homeowners, defendant met with them at their homes or in his office. Defendant told the homeowners that he could save the home from foreclosure by putting it into a trust. He explained that the trust, operated by Good Samaritan, was designed to keep residences safe for homeowners who had poor credit and could not access the equity in the home until the homeowners could improve their credit, refinance the property, and buy it back from the trust. He told the homeowners that they needed to sign a deed giving the house to him or GSS so that he or another buyer could get a loan on the home to pay off the homeowner's loan. He assured the homeowners that they would still own the home, and the home would be deeded back to them once they reestablished their credit and could refinance the property. When homeowners asked defendant why they had to sign a rental agreement if they were still the owners, defendant said it was part of the trust arrangement.

The homeowners, who were not experienced in real estate, testified that they trusted defendant and thought he was placing their home in a trust that would save the home for them. Defendant told them that even though they signed the grant deed, they retained ownership of the home though the placement of the property in the trust. Further, defendant explained to the homeowners that Good Samaritan's services were designed to use the equity in the homes to help the homeowner, and also to help other homeowners who needed assistance, and for this reason the company was called Good Samaritan.

In 2006 and 2007, problems began emerging in the loan payment arrangements. For various reasons, the homeowners stopped sending payments to GSS and/or GSS

5

stopped sending payments to the bank. For most of the homeowners, the loan went into default, and the bank ultimately foreclosed on the home or defendant evicted the homeowner from the home. In June 2006, Cloud, who had become embroiled in a financial dispute with defendant and had started to question whether defendant was helping people, wrote a letter to the district attorney's office describing GSS's practices. Also in 2006 and 2007, some of the homeowners contacted the authorities or retained attorneys, and one of the straw buyers contacted the FBI.

After an investigation by the authorities, defendant was charged with six counts of a prohibited practice by a foreclosure consultant based on his acquisition of an interest in properties in foreclosure (Civ. Code, § 2945.4, subd. (e)) and seven counts of forgery (Pen. Code, § 470, subd. (d)) based on the fabricated home purchase loan applications.[3] The prohibited practice counts were based on the transactions with six of the homeowners.[4] The forgery counts were based on transactions with five of the homeowners whose transactions involved defendant's use of straw buyers.[5]

Defendant represented himself at trial. After hearing the evidence, the jury convicted him as charged. Counsel was appointed for purposes of sentencing, and

---

[3]    Subsequent unspecified statutory references are to the Penal Code.

[4]    The prosecutor did not file a prohibited practice count for the transaction involving the seventh residence because it was not owner-occupied as required by the statutory scheme. (Civ. Code, §§ 2945.4, subd. (e), 2945.1, subd. (f), 1695.1.)

[5]    For the two homeowner transactions for which no forgery charges were filed, GSS sold the home to defendant rather than to a straw buyer hired by defendant.

6

defendant received an eight-year eight-month sentence (four years eight months to be served in the county jail and the remaining four years to be served on supervised community release).

## DISCUSSION

### I.  *Challenges to Prohibited Practice Counts*

#### A.  *Statute of Limitations*

##### 1.  *Application of Four-Years-After-Discovery Statute of Limitations*

Defendant argues that when the prosecution against him was commenced on July 20, 2009 (his arraignment date), the statute of limitations had expired for the counts based on a prohibited practice by a mortgage consultant (Civ. Code, § 2945.4).  Under sections 800 and 801, prosecution of an offense that is punishable by imprisonment for less than eight years (as here) must be commenced within three years after commission of the offense.[6]  Section 801.5 and section 803, subdivision (c), extend the statute of limitations to four years and allow for a discovery tolling period if the offense involves an element of fraud or breach of a fiduciary obligation.[7]  The trial court instructed the jury to resolve the statute of limitations issue under the four-years-after-discovery statute.

---

[6]  The prohibited practices offense is punishable by a sentence of 16 months, two years, or three years.  (§ 1170, subd. (h); Civ. Code, § 2945.7.)

[7]  Section 801.5 states:  "Notwithstanding Section 801 or any other provision of law, prosecution for any offense described in subdivision (c) of Section 803 shall be commenced within four years after discovery of the commission of the offense, or within four years after the completion of the offense, whichever is later."  As we shall discuss, section 803, subdivision (c) describes an offense "a material element of which is fraud or breach of a fiduciary obligation . . . ."

Because the charged prohibited practice offenses were committed in 2004 and 2005, the commencement of the prosecution in 2009 was untimely if the three-year statute of limitations applied. Defendant asserts the three-year statute of limitations applied because the prohibited practice of the acquisition of an interest in a residence in foreclosure does not include an element of fraud or breach of fiduciary obligation within the meaning of section 803, subdivision (c). We disagree.

Section 803 states in relevant part: "(a) Except as provided in this section, a limitation of time prescribed in this chapter is not tolled or extended for any reason. [¶] . . . (c) A limitation of time prescribed in this chapter does not commence to run until the discovery of an offense described in this subdivision. This subdivision applies to an offense punishable by imprisonment . . . , *a material element of which is fraud or breach of a fiduciary obligation . . . .*" (Italics added.)

Appellate courts (including this court) have concluded that section 803, subdivision (c) is applicable if an offense has the prevention of fraud or fiduciary breach as its "core purpose," even if fraud or fiduciary breach is not strictly an element of the offense. (*People v. Guevara* (2004) 121 Cal.App.4th 17, 25-26 [filing a false nomination paper governed by section 803, subdivision (c)]; *People v. Bell* (1996) 45 Cal.App.4th 1030, 1061 [this court's decision holding that offense of filing false or forged documents is governed by section 803, subdivision (c)].) Defendant argues this interpretation is contrary to the statute's plain language because "material element" can only mean an element of the offense that the prosecution must prove. We are not persuaded.

8

When interpreting a statute, our goal is to ascertain and effectuate legislative intent. (*People v. Price* (2007) 155 Cal.App.4th 987, 991.) We construe the words of the statute based on their ordinary and usual meaning and in the context of the statute as a whole. (*Ibid*.)

" 'Material element' " can be defined in its narrow, technical sense to mean an essential element that the prosecution must prove to establish the offense. (See *State v. Reynolds* (Or.App. 2002) 51 P.3d 684, 685-686.) However, it can also be defined in its broader, nontechnical sense to mean an important aspect of the offense. (See Merriam-Webster's Collegiate Dictionary (10th ed. 2002) pp. 715, 372 ["material" means "having real importance or great consequences"; "element" means "a constituent part"].) The latter interpretation is not contrary to the plain language of the statute; rather, it is merely based on everyday usage rather than the technical definition of the term.

We agree with the holdings in *Guevara* and *Bell*, and conclude the Legislature intended the term "material element" to be interpreted based on its nontechnical usage. Generally, the delayed discovery rule is designed to relieve " 'the harshness [of barring prosecution] . . . where it is manifestly unjust to deprive plaintiffs of a cause of action before they are aware that they have been injured.' " (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 826.) Such injustice can arise when the defendant engages in a fraudulent act or a breach of a fiduciary obligation that prevents the plaintiff from being aware of the misconduct or dissuades the plaintiff from investigating the possibility of misconduct. (See *id*. at p. 827.) This unfairness can occur regardless of whether the fraud or fiduciary breach is an actual element of the offense, or whether prevention of

9

fraud or fiduciary breach is the underlying purpose of the statutory enactment. Given the ameliorative purpose of section 803, subdivision (c)'s delayed discovery provision, it makes sense that the Legislature intended the phrase "material element" to be interpreted based on its broader, ordinary usage so as to apply the tolling provision to offenses that target fraud and breach of fiduciary obligations even if these matters are not actual elements of the offense.

As an alternative argument, defendant posits that the prohibited practice offense of acquiring an interest in property in foreclosure (Civ. Code, § 2945.4, subd. (e)), does not have a core purpose of protecting against fraud or breach of a fiduciary obligation. He notes that the offenses in *Guevara* and *Bell* involved falsification of documents, whereas no such falsification is needed to acquire an interest in the homeowner's property. Again, we disagree because it is clear that the prevention of fraud and breach of a fiduciary obligation underlies the statutory scheme governing mortgage foreclosure consultants, including the provision prohibiting acquisition of an interest in the property.

In the introductory provisions of the statute regulating mortgage foreclosure consultants, the Legislature explicitly sets forth its intent to prevent fraud and unfair dealing, stating: "[H]omeowners whose residences are in foreclosure are subject to fraud, deception, harassment, and unfair dealing by foreclosure consultants . . . . [¶] . . . [¶] . . . The intent and purposes of this article are . . . [¶] . . . to safeguard the public against deceit and financial hardship; . . . to prohibit representations that tend to mislead; and to encourage fair dealing in the rendition of foreclosure services." (Civ. Code, § 2945, subds. (a), (c)(1).) To this end, the Legislature imposed a lengthy list of obligations on a

10

foreclosure consultant who contracts with a homeowner whose home is in foreclosure, including, for example, the duty to provide a written contract fully disclosing the exact nature of the consultant's services; to notify the homeowner in "14-point boldface type" that the consultant cannot ask the homeowner to sign any deed; to notify the homeowner in "10-point boldface type" of the right to cancel the transaction within five business days; not to receive any compensation until after the services are fully performed; not to take any security to secure payment of compensation; not to acquire an interest in the residence in foreclosure; and not to take any power of attorney from the homeowner. (Civ. Code, §§ 2945.3, 2945.4.)

A fiduciary obligation arises when a person " 'knowingly undertake[s] to act on behalf and for the benefit of another, or . . . enter[s] into a relationship which imposes that undertaking as a matter of law.' " (*City of Hope National Medical Center v. Genentech, Inc*. (2008) 43 Cal.4th 375, 386.) A foreclosure consultant who contracts with a homeowner whose property is facing foreclosure has undertaken an obligation to act for the benefit of the homeowner and is subject to strict statutory oversight. As such, a foreclosure consultant falls into the category of persons who owe fiduciary obligations to his or her clients. (See, e.g., *George Ball Pacific, Inc. v. Coldwell Banker & Co.* (1981) 117 Cal.App.3d 248, 256 [real estate broker owes fiduciary duties to client]; *Apollo Capital Fund LLC. v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 245 [stockbroker who advises on investment decisions owes fiduciary duty].) And, by acquiring an interest in the homeowner's property, the foreclosure consultant has violated

11

one of the statutorily-defined fiduciary obligations.  It is clear that this prohibited practice offense has at its core the prevention of a breach of fiduciary obligation.

We conclude the four-years-after-discovery provision applies to the prohibited practice counts.

### 2. *Substantial Evidence of Delayed Discovery*

Even applying the four-years-from-discovery statute of limitations, defendant asserts the evidence does not support the jury's finding that the discovery of the prohibited practice offenses occurred on or after July 20, 2005, so as to make the July 20, 2009 commencement of the prosecution timely.  He contends the homeowners discovered or should have discovered the offenses when they signed the deeds transferring the properties to GSS, which occurred in 2004 and January 2005.

An offense is discovered when either the victim or law enforcement learns of facts which, when investigated with reasonable diligence, would make the person aware a crime had occurred.  (*People v. Wong* (2010) 186 Cal.App.4th 1433, 1445.)  The crucial determination is whether the victim or the authorities had actual notice of circumstances sufficient to make them suspicious of fraud or breach of a fiduciary obligation leading them to make inquiries that might have revealed the misconduct.  (*Ibid*.)  However, when there is a fiduciary relationship between a defendant and a victim, "facts which ordinarily require investigation may not incite suspicion . . . ."  (*Hobbs v. Bateman Eichler, Hill Richards, Inc.* (1985) 164 Cal.App.3d 174, 201.)  In this circumstance, "the duty to investigate may arise later because the [victim] is entitled to rely upon the assumption that his fiduciary is acting on his behalf."  (*Id*. at p. 202.)

The prosecutor must prove that the prosecution is timely by a preponderance of the evidence. (*People v. Wong, supra*, 186 Cal.App.4th at p. 1444.) On appeal, we review the record in the light most favorable to the judgment and draw all reasonable inferences that the jury could draw from the evidence. (*Ibid*.)

The record supports that when the homeowners signed the deeds transferring title to their residences in 2004 and early 2005, they thought they were transferring their home to a trust which would safeguard the property on their behalf, and hence they were not aware of facts giving rise to a suspicion that there had been a prohibited transfer to a foreclosure consultant. By contracting to help the homeowners save their homes from foreclosure, defendant assumed the fiduciary obligations defined in the Civil Code for foreclosure consultants. The homeowners consistently testified that although they signed a deed transferring the property to GSS, defendant told them that under the trust arrangement the home still belonged to them and it would be transferred back to them when they could improve their credit and obtain refinancing. Given defendant's status as a foreclosure consultant subject to statutorily-specified duties of disclosure and fair dealing, the jury could reasonably consider that the homeowners were entitled to rely on defendant's expertise and the truth of his representations when he described the transaction as effectively retaining their ownership interests in the property notwithstanding the execution of the deeds.

Because defendant led the homeowners to believe that under the terms of the transfer he did not own their homes, but rather the trust owned the home for the benefit of the homeowner, the jury could reasonably find that when the homeowners signed the

13

grant deeds in 2004 and early 2005 they were unaware of facts triggering a duty to investigate the possibility of a prohibited transfer of interest to a foreclosure consultant. Thus, the jury was not required to find that the offenses were discovered, or should have been discovered, prior to July 2005 so as to make the July 2009 commencement of the prosecution untimely.

### B.  *Substantial Evidence of Residence in Foreclosure*

With respect to the prohibited practice counts, defendant argues there was insufficient evidence to support the statutory requirement that the homeowners' residences were in foreclosure based on outstanding recorded notices of default at the time he acquired the interests in their properties.  He contends that although the prosecution presented evidence that notices of default were recorded at some point before he acquired the interests, it did not present evidence that they were *still outstanding* when he acquired the interests.

Civil Code section 2945.4, subdivision (e) makes it unlawful for a foreclosure consultant to "[a]cquire any interest in a residence in foreclosure from an owner with whom the foreclosure consultant has contracted."  A residence in foreclosure is defined as "residential real property consisting of one- to four-family dwelling units, one of which the owner occupies as his or her principal place of residence, and against which there is *an outstanding notice of default, recorded* pursuant to [section 2920 et seq.]." (Civ. Code, §§ 1695.1, italics added, 2945.1, subd. (f).)

In reviewing a challenge to the sufficiency of the evidence, we consider the entire record and draw all reasonable inferences in favor of the judgment to determine whether

14

a reasonable trier of fact could find the elements of the offense beyond a reasonable doubt. (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) The same standard applies when the prosecution relies primarily on circumstantial evidence. (*Ibid.*) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) To carry its burden of proof, the prosecution is not required to "call all witnesses or introduce all exhibits or documents referred to in the testimony or suggested by the evidence." (*People v. Simms* (1970) 10 Cal.App.3d 299, 313.) "Unless it is clearly shown that 'on no hypothesis whatever is there sufficient substantial evidence to support the verdict' the conviction will not be reversed." (*People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1114.)

At trial, the prosecution submitted into evidence notices of default for each of the homeowners involved in the prohibited practice counts. Each notice of default was recorded prior to the time defendant acquired the interest in the property. Also, the homeowners testified that they contacted defendant and agreed to the trust transaction because they were behind in their mortgage payments and/or their homes were in foreclosure and defendant told them he could save their homes from foreclosure.

To illustrate, the evidence included the following.

(1) For homeowner Kathy Barnes, the prosecution submitted a notice of default recorded on January 7, 2004, and a trust agreement and deed for the GSS transaction signed by Barnes on February 3, 2004. Barnes testified that she missed three mortgage payments in late 2003; she met with defendant in December 2003 and January 2004 to

15

discuss what she could do in the event of foreclosure; and defendant provided money to get her home out of foreclosure.

(2)  For homeowner Leotha Britt, the evidence showed a July 21, 2003 recorded notice of default, and a September 21 and 22, 2004 signed trust agreement and deed, respectively.  Britt testified that in 2004 she fell behind on her mortgage payments "to the point of foreclosure"; defendant told her he would be able to save her home from the foreclosure; Britt signed the deed because she was desperate and "trying to save [her] home"; and she filed for bankruptcy to stop the foreclosure because the house was going to be sold through foreclosure "within a couple of days[.]"

(3)  For homeowner Ruta Tavale, the evidence showed a September 8, 2004 recorded notice of default, and an October 13 and 20, 2004 signed trust agreement and deed, respectively.  Tavale testified that in 2004 she was falling behind on her mortgage payments; she received notices from the bank about foreclosure; defendant told her he could stop the foreclosure; and she entered into the transaction to get out of foreclosure.

(4)  For homeowner Ominae Aiono, the evidence showed a January 30, 2002 recorded notice of default, and a January 7 and 11, 2005 signed trust agreement and deed, respectively.  Aiono testified that he had trouble making his mortgage payments in the early 2000's; by the time he met with defendant he was about $12,000 behind in his $1,900 monthly payment; he told defendant about his "foreclosure situation"; and defendant said GSS could get him out of foreclosure.

(5)  For homeowner Larry Bridges, the evidence showed a November 30, 2004 recorded notice of default, and a January 31, 2005 signed trust agreement and deed.

16

Bridges testified that he was three months behind on his mortgage and the home started going into foreclosure in the summer; he contacted defendant in the fall; and defendant said he could give him a loan to help him catch up with his mortgage and he would pay defendant instead of a bank.[8]

(6)  For homeowner Andrew Bulinski, the evidence showed an August 2, 2004 recorded notice of default, and a January 6, 2005 signed trust agreement and deed. Bulinski testified that he began falling behind in his mortgage payments and received notices from his bank about defaulting on the loan; he contacted the bank and was told they could not help him; he "started panicking" and contacted defendant in early 2005; defendant told him he could save his home; and when Bulinski signed the documents provided by defendant Bulinski was "desperate."

The documents showing that notices of default had been recorded, combined with the homeowners' testimony reflecting that they were trying to save their homes from foreclosure when they contacted defendant, provides substantial evidence to support the jury's finding that the default notices were still outstanding when defendant acquired the interests in the properties.

To support his challenge to the sufficiency of the evidence, defendant notes that the prosecution could have presented evidence indicating that a records search had been conducted and that no notices of rescission of the notices of default had been recorded at

---

[8]    Bridges testified that the foreclosure process started in the summer of 2005 and his initial contact with defendant occurred in the fall of 2005, whereas the relevant documents show the time periods he referenced were in 2004.

17

the time he acquired the interests in the homes. The absence of this evidence does not defeat the support for the findings that there were outstanding notices of default. As stated, the prosecution is not required to present all evidence that could support the alleged charges. On appeal, our inquiry is whether there is substantial evidence supporting the jury's finding that the element was established beyond a reasonable doubt. This standard is met here.[9]

## II. *Challenges to Forgery Counts*

### A. *Substantial Evidence of Misconduct Constituting Forgery*

Defendant argues the record does not support that the charged acts constituted forgery. He asserts the prosecution's theory was that he committed forgery by directing the loan applicants to inflate income and assets on the loan applications; forgery requires a false writing that purports to be that of another or something that it is not; the loan applications were signed by the applicants and were what they purported to be; and the mere inclusion of false information contained in a document does not constitute forgery.

The offense of forgery is committed when the defendant, with the intent to defraud, falsely makes or passes, as true and genuine, a writing that, if genuine, creates some legal right or obligation. (§ 470, subd. (d); *People v. Gaul-Alexander* (1995) 32 Cal.App.4th 735, 741-742.) However, when a document is what it purports to be, the inclusion of false statements within the instrument may constitute false pretenses, but it

---

[9] In the habeas petition considered with this appeal, we conclude defendant has not set forth a prima facie case for relief based on his submission of notices of rescission of the notices of default for three homeowners.

does not constitute forgery.  (2 Witkin, Cal. Criminal Law:  Crimes Against Property (4th ed. 2012) § 194, pp. 244-245.)  "[F]orgery directly implicates the writing itself, not the oral or implied misstatement about the writing."  (*Id*. at p. 245)  To constitute forgery based on the creation or use of a fraudulent document, the "*instrument must fraudulently purport to be what it is not*."  (*People v. Bendit* (1896) 111 Cal. 274, 277.)  " 'The term falsely, as applied to making or altering a writing in order to make it forgery, has reference not to the contents or tenor of the writing, or to the fact stated in the writing, because a writing containing a true statement may be forged or counterfeited as well as any other, but it implies that *the paper or writing is false, not genuine, fictitious, not a true writing, without regard to the truth or falsehood of the statement it contains* --a writing which is the counterfeit of something which is or has been a genuine writing, or one which purports to be a genuine writing or instrument when it is not.' "  (*Id*. at p. 279, italics added.)  That is, "[t]hough a forgery, like false pretenses, requires a lie, *it must be a lie about the document itself:[] the lie must relate to the genuineness of the document*."  (LaFave, Substantive Criminal Law (2d ed. 2013) § 19.7, subd. (j)(5), p. 138, italics added, fn. omitted.)

The jury was instructed that to convict defendant of forgery the defendant must have "falsely made a residential loan application" or "passed or used a false residential loan application."  The evidence showed that defendant caused the submittal of home purchase loan applications (and accompanying documentation) to the banks purporting to be applications from persons who were seeking loans to purchase the homes, whereas in fact the persons identified in the loan applications were *not* purchasing the homes and

were *not* applying for loans for a home purchase transaction.[10] Rather, the persons identified on the home purchase loan applications were hired by defendant to pose as buyers.[11] Although the straw buyers may have filled out the loan applications, they did so at defendant's direction and thus the creation and use of the documents could properly be attributed to defendant.

In short, defendant caused documents to be submitted to the banks that purported to be genuine home purchase loan applications that were not home purchase loan applications at all because there was no real buyer and no home actually being sold to a buyer. The home purchase loan documents did not merely contain false statements about such matters as the buyer's income and assets; rather, the documents themselves were fake representations of a nonexistent transaction. Thus, defendant created and used a document that purported to be a genuine home purchase loan application that was not in fact a genuine document because a home buyer and a home purchase transaction did not exist. This factual scenario supported the forgery counts.

Defendant also argues the loan applications were not subject to the forgery statute because they did not create a legal duty on the part of the bank to approve the loan applications. The forgery offense applies to fabricated documents that will damage the legal rights, usually money or property, of a person who acts upon the document as

---

[10] In addition to the loan applications themselves, the banks also received the residential purchase agreements between the straw buyer and GSS and, for some transactions, copies of fake documents showing corporate stock ownership.

[11] See footnote 5, *ante*.

genuine. (*People v. Gaul-Alexander, supra*, 32 Cal.App.4th at p. 742; *People v. Vincent* (1993) 19 Cal.App.4th 696, 700; *People v. McKenna* (1938) 11 Cal.2d 327, 332 ["Whether the forged instrument . . . , if genuine, would create a legal liability, is immaterial; the test is whether upon its face it will have the effect of defrauding one who acts upon it as genuine."].) Although the bank was not required to approve the loan application, when it did so it was acting upon the document as a genuine home purchase loan application. The bank's right not to extend loans for nonexistent transactions was prejudiced by the fabricated document. There was no error in applying the forgery statute to defendant's conduct of creating or using the fabricated home purchase loan applications.

B. *Failure To Instruct on Aiding and Abetting for Forgery*

Defendant contends the prosecutor relied on aiding and abetting principles for the forgery counts and hence the court erred in failing to sua sponte instruct the jury on aiding and abetting.

A trial court must sua sponte instruct on general principles of law that are commonly connected to the facts adduced at trial and that are necessary for the jury's understanding of the case. (*People v. Young, supra*, 34 Cal.4th at p. 1200.) The court must instruct on every theory of the case supported by substantial evidence. (*Ibid*.) The perpetrator of a crime is the person whose culpability is premised on his or her own commission of acts that constitute the crime. (See *People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) An aider and abettor of a crime is a person whose culpability is premised on his or her assistance or encouragement of the perpetrator's acts. (See *ibid*.) To

21

establish culpability based on aiding and abetting, the defendant must have had knowledge of the perpetrator's unlawful purpose, intended to commit or encourage the offense, and by act or advice aided or encouraged the commission of the offense. (*People v. Williams* (1997) 16 Cal.4th 635, 676.)

When the evidence can support culpability based on aiding and abetting, the jury should be instructed on the intent necessary to establish guilt on this theory. (See *People v. Williams, supra*, 16 Cal.4th at p. 676.) However, instructions on aiding and abetting are not required where the defendant was not tried as an aider and abettor and there was no substantial evidence to support the theory. (*People v. Young, supra*, 34 Cal.4th at p. 1201.) Evidence is substantial if a reasonable jury could find it persuasive. (*Id.* at p. 1200.)

Contrary to defendant's contention, the record shows that defendant was tried as the actual perpetrator of the forgery, not as an aider and abettor. The prosecution's theory was that defendant was the actual perpetrator because he masterminded the fraudulent home purchase loan application scheme and instructed the straw buyers on how to fill out the documents. Although the straw buyers may have been defendant's accomplices because they helped defendant, there was no claim by the prosecutor that defendant could be culpable as a facilitator of the straw buyers even if he was not the direct perpetrator.[12]

---

[12] The jury was instructed that the straw buyers were accomplices and were instructed on the corroboration requirement for accomplice testimony. (See CALCRIM No. 335.) The prosecutor referred to the accomplice corroboration requirement in closing arguments, but did not suggest that defendant's liability could be premised on aiding and abetting the straw buyers.

Defendant contends he could not be prosecuted as the direct perpetrator because he did not personally produce the loan applications but directed others to do so. The contention is unavailing. The evidence showed that defendant in effect committed the acts of fabricating the loan applications by directing his subordinates to prepare the documents per his instructions. In this context, defendant used agents to commit acts for him, which can make him culpable as the perpetrator. (*People v. Waxman* (1952) 114 Cal.App.2d 399, 407-408; see 17 Cal.Jur. 3d (2010) Criminal Law: Core Aspects, § 128, pp. 224-225.) This is not a case where the defendant merely assisted or encouraged other persons to commit the acts underlying the criminal offense; rather, defendant himself generated and controlled the acts through the use of subordinates who obeyed his directions.

Because defendant was not tried on an aiding and abetting theory and there was no substantial evidence to support that he was merely a facilitator and not an actual perpetrator, the trial court was not required to sua sponte instruct on aiding and abetting principles.

Alternatively, even assuming arguendo the trial court should have instructed on aiding and abetting, the error was harmless beyond a reasonable doubt. (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1274.) The jury was instructed that to find defendant guilty of forgery, the prosecution had to prove that defendant made or used a false residential loan application; that he knew the application was false; and that he intended that the application be accepted as genuine and intended to defraud. (See CALCRIM Nos. 1904, 1905.) Thus, the instructions required the jury to find defendant

23

committed the acts and had the requisite state of mind for forgery, and the jury was not led to believe that it could find him guilty based merely on an accomplice's acts or state of mind.

Defendant argues that because the jury was not instructed on aiding and abetting, it did not know that the straw buyers who actually filled out the loan applications had to have acted with intent to defraud in order to find defendant guilty as an aider and abettor. This contention is based on a misunderstanding of aider and abettor principles. Aiding and abetting culpability may be based on the combined acts of the perpetrator and aider and abettor, but the culpability of each turns on his or her own individual mens rea. (*People v. McCoy, supra*, 25 Cal.4th at p. 1120.) The fact that the direct perpetrator may have a lesser (or no) culpability does not exonerate an aider and abettor who acts with the state of mind required for the charged offense. (*Id*. at p. 1121.)

There was no reversible error arising from the failure to instruct on aiding and abetting.

### III. *Restitution*

#### A. *Restitution Awarded to Wilson*

After holding a restitution hearing, the trial court ordered defendant to pay restitution to the homeowners based on the amount of equity they had in their homes at the time of defendant's misconduct. Defendant asserts there was no evidence to support a finding of compensable loss by one of the victims (Michael Wilson) because Wilson's father was the owner of the home, and Wilson was a victim associated with the forgery, but not the prohibited practice, counts. The Attorney General contends this challenge is

forfeited on appeal because although defendant challenged the amount of the award to Wilson, he did not raise the issue of Wilson's lack of ownership of the home.

To avoid a forfeiture on appeal, the defendant must generally raise restitution objections to the trial court. (*People v. Gonzalez* (2003) 31 Cal.4th 745, 755.) In any event, even assuming arguendo the issue is not forfeited, the record supports the award to Wilson.

The trial court is required to award restitution to "a victim [who] has suffered economic loss as a result of the defendant's conduct . . . ." (§ 1202.4, subd. (f).) A victim is a person who is the object of a crime. (*People v. Crow* (1993) 6 Cal.4th 952, 957.) On appeal, we review the trial court's restitution order for abuse of discretion. (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542.) No abuse of discretion will be found where there is a rational and factual basis for the restitution order. (See *ibid*.)

The prosecution did not file a prohibited practice count for the transaction associated with Wilson because the residence was not owner-occupied as required by the prohibited practices statutory scheme. (See fn. 4, *ante*.) The forgery counts were based on the fabricated loan applications, and defendant argues that the bank (not Wilson) was the direct victim of the forgery and Wilson has not suffered an economic loss based on the forgery.

Although Wilson did not directly suffer loss from the forgery, he nevertheless was a direct victim of, and suffered economic loss from, defendant's overall trust agreement scheme. Wilson testified that his father originally purchased the home and title to the home was in his father's name, but Wilson made the monthly mortgage payments and

25

lived there with his family. Wilson met with defendant and decided to use GSS's services, and thereafter brought his father to a meeting with defendant to sign the necessary documentation. Wilson explained that his father let him decide whether to sign up for GSS services, stating: "[M]y dad left it in my purview to do. At the time I was messing up my father's credit. I wanted to get my dad's name off of the credit. So this was like [a] last shot. We'll do this, get his name out of it, and he won't have anything to do with the house anymore."

Drawing all inferences in favor of the court's ruling, the evidence showed that Wilson paid the mortgage, used the home as his permanent residence, and had an understanding with his father that the house effectively belonged to him. This provided a reasonable basis for a finding that he suffered economic loss from defendant's misconduct. Further, because Wilson lived in and was financially responsible for the residence and met with defendant to secure GSS's services, he was the object of defendant's misconduct. Under these circumstances, he can reasonably be characterized as a victim of defendant's misconduct even though he was not the title owner and his transaction did not correlate with the prohibited practice counts. The record supports the trial court's inclusion of Wilson in the victim restitution award.

### B. *Correction of Minute Order and Abstract of Judgment*

The parties agree, as do we, that the minute order and abstract of judgment should be corrected to remove a parole revocation restitution fine (§ 1202.45) that was not imposed by the court and that is not authorized given that defendant is serving his sentence in local custody and will not be paroled.

26

DISPOSITION

The judgment is modified to remove the parole revocation restitution fine from the minute order.  As so modified, the judgment is affirmed.  The superior court is directed to correct the abstract of judgment to remove the parole revocation restitution fine and to transmit a corrected abstract of judgment to the local custody officials and to the California Department of Corrections and Rehabilitation as necessary.


                                                                          HALLER, Acting P. J.

WE CONCUR:


McDONALD, J.


O'ROURKE, J.