Filed 10/4/16  P. v. Oh CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G051291 |
| v. | (Super. Ct. No. 12CF1632) |
| SANGJIN MILLER OH, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John S. Adams, Judge.  Affirmed.

Mark S. Devore for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Brendon W. Marshall and Christopher Beesley , Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Sangjin Miller Oh of five counts of perjury (Pen. Code, § 118, subd. (a); all further statutory references are to the Penal Code unless otherwise stated), and found true an allegation the statute of limitations commenced in December 2010. The court suspended execution of sentence and placed defendant on formal probation for three years.

Defendant argues the court erroneously denied his (1) motion to suppress evidence (§ 1538.5), (2) motion to dismiss charges for outrageous government conduct, (3) motion for a judgment of acquittal (§ 1118.1) on the statute of limitations, and (4) his request for a defense pinpoint instruction on the statute of limitations. He also challenges the sufficiency of the evidence to support some counts. We affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

Defendant is a former mayor, and city councilmember, for the City of Buena Park. In October 2010, the Orange County District Attorney's Office received election-related complaints about defendant. The case was assigned to Investigator Stanley Berry. During the course of Berry's investigation, he discovered evidence suggesting defendant had two California driver's licenses.

In December, Berry contacted the Department of Motor Vehicles (DMV), and asked one of their investigators, Francisco Paredes, for information. Paredes did some research and discovered the driver's license numbers Berry identified were linked to individuals with similar names, but different social security numbers. He decided to investigate whether one, or both, of the driver's licenses had been the subject of identity theft.

In January 2011, Paredes asked defendant to come to the DMV office in Irvine for an interview. Defendant brought some documents with him showing his name, Sangjin Miller Oh, or Sang J. Oh, his date of birth (January 1964), and a social security number beginning with 602.

2

Paredes showed defendant another driver's license with the name Robert S. Oh, a date of birth in December 1957, and a social security number starting with 612. After being confronted with this information, defendant admitted he applied for a second license using his catholic confirmation name and his lunar birthday to avoid paying child support. Paredes had defendant write a two-page confession, and he forwarded defendant's confession and a report to Berry in August 2011.

In the meantime, Paredes contacted Yolanda Campos, an investigator with the Social Security Administration (SSA). Campos gave Paredes reports pertaining to both of the SSA numbers linked to defendant, and Paredes passed this information on to Berry.

In May 2012, Berry, Paredes, and Campos interviewed defendant. Defendant told them he came to the United States in 1989 on an investor visa. He became a lawful permanent resident in 2002, and a naturalized United States citizen in 2009. Defendant said his true name is Sangjin Miller Oh, he was born in January 1964, and his social security number begins with 602. Defendant explained that Robert was his catholic confirmation name, but he denied December 1957 was his lunar birthday.

Defendant, again, admitted he had two driver's licenses. He initially denied any knowledge of the 612 social security number. Later, defendant admitted hiring someone to apply for a new social security number and driver's license on his behalf because his bank accounts were frozen for nonpayment of child support.

Defendant also admitted using his second driver's license number to register three vehicles, and he admitted knowing the information he used in the second driver's license application, and the vehicle registrations, had been false.

After a preliminary hearing, the district attorney filed an information alleging defendant committed perjury on July 20, 2009, by failing to disclose a driver's license suspension in an application (count 1), on January 12, 2005, December 29, 2007, and March 20, 2008, when he applied for vehicle registration using the second driver's

3

license number (counts 2, 3, 4), and on September 23, 2004, by not disclosing the existence of his first driver's license number on the application for the second license (count 5).

With regard to the statute of limitations, the amended information alleged the DMV did not have actual or constructive knowledge of defendant's crimes until December 2010 when Berry contacted Paredes. Because the DMV computer searches by name, date of birth, and social security number, and its computer system does not have facial or fingerprint recognition software, defendant's use of different biological information made it impossible for the DMV to detect.

At trial, Paredes testified the DMV first issued a driver's license to defendant in the name Miller Jin Oh with a birthdate in January 1964 and a social security number beginning with 602. Defendant's photograph, fingerprints, and signature were obtained at the time of application. Defendant received at least six physical replacement licenses over the next 16 years, and he changed the name on the license at least three times.

In November 1997, defendant applied for a second driver's license using the name Robert S. Oh with a date of birth in December 1957 and a social security number beginning with 612. Again, defendant's photograph, fingerprints, and signature were obtained at the time of application. He changed the name on the license to Sangjin Oh in 1999. He received at least four physical replacement licenses over the next eight years for his second driver's license.

Paredes also testified that on January 12, 2005, December 29, 2007, and March 20, 2008, defendant used the second driver's license to register vehicles. To complete the vehicle registration forms, defendant signed the form, which "*certify*[*ied*] *under penalty of perjury under the laws of the State of California that the information entered on this form is true and correct.*"

4

Paredes explained the DMV computer system is not equipped with facial or fingerprint recognition software, nor does it have the ability to cross-reference driver's license applications. The computer system will flag identical names and social security numbers, but the system does not alert with similar names or addresses, even if the name is associated with a previously issued driver's license. The DMV simply had no mechanism to discover individual applicants filing for multiple licenses if, like defendant, they used different birthdates, names, and social security numbers. Thus, according to Paredes, the DMV had no actual knowledge defendant had been issued two driver's licenses until Berry contacted him in December 2010.

On cross-examination, Paredes acknowledged that DMV records indicated, defendant waited five years to receive a physical replacement for his first driver's license after he applied for his second license. However, he also said a five-year delay in receiving a replacement license would not be unusual, and could have been caused by any number of factors, including the filing of an incomplete application. Paredes acknowledged it was possible the DMV fraud unit knew defendant had two licenses before December 2010, but he had found nothing in the DMV records to indicate this occurred.

Defense counsel asked Paredes to assume someone used similar names on license application forms, and suffered a five-year delay in the DMV sending a replacement license, and wondered if, "maybe [this] should have been recognized by somebody at the [DMV] at some point in time." Paredes responded, "there's lots of stuff that should be recognized at the [DMV], but if there would have been pending investigation or a document would have been flagged, there would have been a control hold on that document, on both driver's licenses. . . ."

Campos testified the SSA did not independently discover defendant's second social security number because, like the DMV, her agency does not have the ability to track people when they use different names and dates of birth.

Kathleen Frame, an officer with the Department of Homeland Security, testified her agency had not noticed defendant's multiple dates of birth and social security numbers. She also testified that had the agency noticed what defendant had done, someone would have done a thorough background check.

Defendant's ex-wife testified defendant told her his lunar birthday was in December 1957, which corresponded with a solar calendar date in January 1965. They celebrated his birthday in December. The couple separated and divorced around 1996, but defendant's ex-wife denied having trouble collecting court-ordered child support from him.

Defendant's brother, Joseph Oh, was born in 1947, and he is 10 years defendant's senior. Joseph testified the family celebrated defendant's birthday in December.

## DISCUSSION

### 1. *Motion to Suppress*

#### *a. Background*

Defendant moved to suppress all evidence originating from the California Public Employees Retirement System (CALPERS), the Buena Park City Clerk's Office, the United States Citizenship and Immigration Service (USCIS), the SSA, and any medical information.

The motion stated Berry went to the Buena Park City Clerk's Office and asked for any documents showing defendant's date of birth and social security number. At his request, and without further authorization, the clerk handed Berry a number of documents that contained defendant's personal information, including applications and other papers from CALPERS, USCIS, and SSA, and some documents defendant completed in connection with his position as a member of the Buena Park City Council.

6

In addition, Paredes contacted Campos and received certified copies of SSA records for both of defendant's SSA numbers, plus notification of his immigration status, without any formal request or court order.

Defendant collected the documents and put them into two portfolios, which the court designated exhibits A and B. The court ordered the exhibits sealed and placed in confidential envelopes at the conclusion of the hearing. They were not introduced at trial.

Defendant, relying on *Burrows v. Superior Court* (1974) 13 Cal.3d 238, 243, and state and federal privacy statutes,[1] argued the documents Berry and Paredes informally received, and any secondary evidence derived from these documents, must be suppressed under the Fourth Amendment to the United States Constitution.

The prosecution, relying on *United States v. Miller* (1976) 425 U.S. 435, 439 (*Miller*), asserted defendant had no legitimate expectation of privacy in the documents and information he sought to suppress, and assuming otherwise, defendant failed to show suppression of the evidence at trial was an appropriate remedy for violations of state or federal privacy laws.

The court acknowledged the informal method Berry and Paredes used to obtain documents from the Buena Park City Clerk's Office and SSA and characterized them as violations of the "rules." However, citing *Miller,* the court determined defendant's subjective belief in the confidentiality of the disclosed information was not objectively reasonable under the Fourth Amendment, and denied defendant's motion.

---

[1] Defendant also cited 5 United States Code section 522a, the "Privacy Act of 1974," which prohibits federal agencies from disclosing any record kept by the agency without going through a particular procedure, Government Code sections 20230, 31532, which protect CALPERS information and limits the release of information, and Civil Code section 6454.29, which sets out certain information release procedures for local agencies. The Attorney General concedes none of the involved public agencies followed their statutory procedures.

*b. Standard of Review*

On review of an order denying a motion to suppress evidence, the appellate court views the facts most favorably to the prosecution and upholds the trial court's factual findings if supported by substantial evidence. (*People v. Ayala* (2000) 23 Cal.4th 225, 255.) We conduct an independent review of whether, based on the historical facts, the search or seizure was reasonable under the Fourth Amendment. (*People v. Weaver* (2001) 26 Cal.4th 876, 924.)

The Fourth Amendment protects "against unreasonable searches and seizures" by the police. (U.S. Const., 4th Amend.) Evidence obtained in violation of this guarantee may not be used in a subsequent prosecution. (*Mapp v. Ohio* (1961) 367 U.S. 643, 655.) But, in order to claim Fourth Amendment protection, a defendant must first demonstrate a reasonable expectation of privacy in the things or place searched. (*Minnesota v. Carter* (1998) 525 U.S. 83, 88.) An expectation is reasonable when it is "one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" (*Ibid.*)

*c. Analysis*

Defendant reasserts the same arguments he made below. Defendant does not specify which trial exhibits were improperly admitted. Instead, he asserts his right to privacy created a Fourth Amendment right to the exclusion of all documents, and any information obtained as a result of these documents. The Attorney General asserts there was no Fourth Amendment violation and, in any event, defendant suffered no prejudice as a result of the court's ruling because exhibits A and B were not admitted into evidence.

Our analysis begins with *Miller.* Miller was convicted of possessing an unregistered still and related charges. (*Miller, supra,* 425 U.S. at p. 436.) Federal agents served subpoenas deuces tecum to two banks. (*Ibid.*) The banks permitted the agents to look at microfilms of Miller's bank records, and the agents obtained copies of certain

checks and deposit slips. (*Id.* at pp. 436-437.) Miller unsuccessfully moved to suppress those records, and the records were admitted at trial to establish specific overt acts necessary to prove the charges. (*Id.* at p. 437.) The circuit court of appeals reversed the lower court, but the United States Supreme Court reversed. (*Ibid.*)

The court first observed that the documents were not Miller's "'private papers,'" but "business records of the banks." (*Miller*, *supra*, 425 U.S. at pp. 440-441.) "The checks are not confidential communications but negotiable instruments to be used in commercial transactions. All of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business. . . ." (*Id.* at p. 442.)

"This court has repeatedly held that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." (*Miller*, *supra*, 425 U.S. at pp. 442-443.) In short, Miller had no "legitimate expectation of privacy" in the documents. (*Miller*, *supra*, 425 U.S. at pp. 442-443.)

In this case, defendant voluntarily provided biographical information to several government agencies to obtain services, or as an employee entitled to benefits. In the process, he completed forms promulgated by the agencies for the collection of data pertinent to the agencies' business. These were not confidential communications, nor defendant's private papers. Thus, while defendant may have a civil remedy available against these agencies, he had no legitimate expectation of privacy in their records.

*Miller* also rejected defendant's notion state or federal privacy regulations alone created a legitimate expectation of privacy requiring Fourth Amendment protection. "This analysis is not changed by the mandate of the Bank Secrecy Act that records of depositors' transactions be maintained by banks." (*Miller*, *supra*, 425 U.S. at p. 443; see *People v. Meyer* (1986) 183 Cal.App.3d 1150, 1163.)

9

Defendant attempts to distinguish *Miller* and its progeny by arguing banking records are controlled by a statutory scheme designed to assist in criminal, tax, or regulatory investigations or proceedings, while the information he seeks to protect is guarded by policies solely designed to facilitate privacy. While true, he also admits, "there appears to be no case law, state or federal, directly on point with the facts here."

Defendant argues privacy violations are more egregious when committed by governmental bodies. But, again, there is no authority for holding government agencies to a higher standard, and the United States Supreme Court takes a dim view of excluding relevant evidence at trial. As noted by the Court in *Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331, 347-349, "Under our domestic law, the exclusionary rule is not a remedy we apply lightly. '[O]ur cases have repeatedly emphasized that the rule's "costly toll" upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule.' [Citation.] Because the rule's social costs are considerable, suppression is warranted only where the rule's "'remedial objectives are thought most efficaciously served."' [Citations.]" (*Id.* at pp. 347-348.)

Thus, even assuming violations of federal or state privacy laws, we conclude defendant's remedy lies outside the Fourth Amendment. (See *United States v. Caceres* (1979) 440 U.S. 741, 754 [evidence obtained in violation of agency regulations not subject to suppression in a criminal case].)

2. *Motion to Dismiss*

In conjunction with his motion to suppress evidence, defendant filed a motion to dismiss on grounds Berry and Paredes engaged in outrageous government conduct by violating state and federal privacy statutes.

The court denied the motion, stating, "I just think this is far short of what I would call outrageous government conduct. I do think that frankly they failed to comply with what I see as fairly technical regulations. Outrageous government conduct that qualifies – that rises to the level of a situation where the government will dismiss the

10

case, tends to be situations where the government – I'll give an example, where the government gets itself involved in a criminal enterprise for a substantial period of time in order to – in order to induce individuals to participate in that enterprise. And that tends to be the situation where outrageous government conduct applies. [¶] I understand that it's a difference in degree, and [defense counsel] believes that the government simply requested these documents without any court process was just as outrageous as the examples that I – as the example that I provided. I just don't view it that way. I think that this sort of conduct is not outrageous government conduct. It does not rise to the level of where the court would be required to step in and dismiss the case."

We agree with the court's assessment of the issue. To prevail on a claim of outrageous government conduct, the defendant must show the state engaged in conduct that shocks the conscience or is repugnant to the universal sense of justice. (*Rochin v. California* (1952) 342 U.S. 165 (*Rochin*); *People v. Uribe* (2011) 199 Cal.App.4th 836 (*Uribe*).) However, few cases rise to this level. (*United States v. Santana* (1st Cir. 1993) 6 F.3d 1, 4). In general, successful claims have involved violations of the defendant's bodily integrity (*Rochin*), government agents engaging in entrapment (*Greene v. United States* (9th Cir. 1971) 454 F.2d 783.), or intentional interference with the right to counsel (*People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439).

In, *Rochin*, government agents entered the defendant's home without a warrant on suspicion of drug sales. They forced open the door to a room, witnessed the defendant swallowing capsules next to his bed, and arrested him. When the agents took the defendant to the hospital, they directed doctors to pump his stomach and discovered two capsules containing morphine. (*Rochin*, *supra*, 342 U.S. at p. 166.)

The United States Supreme Court reviewed a federal due process claim, and "conclude[d] that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically. This is conduct that shocks the conscience . . . ." (*Rochin*,

11

*supra*, 342 U.S. at p. 172.) Because the conviction had been obtained by such "brutal and . . . offensive" means, it violated the federal due process clause. (*Id.* at p. 174.)

Subsequent decisions emphasize the governmental conduct must "shock the conscience" for a due process violation. (See, e.g., *United States v. Salerno* (1987) 481 U.S. 739, 746 [substantive due process prevents governmental behavior that is conscience-shocking or interferes with rights implicit in concept of ordered liberty]; *Breithaupt v. Abram* (1957) 352 U.S. 432, 435 ["conduct must be "so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency"].)

While Paredes and Berry did not follow statutory procedures to obtain defendant's personal information, their method was far from brutal or offensive. They merely requested documents from other government agencies, and these agencies voluntarily complied. This is a far cry from the kind of conduct previously condemned by the United States Supreme Court.

*3. Statute of Limitations*

  *a. Section 1118.1 Motion*

At the close of the prosecution's case, defense counsel moved to dismiss counts 2 through 5 based on the statute of limitations. (§ 1118.1.) Defendant argued certain facts proved the DMV had constructive knowledge of his second license in September or October 2004. At that time, he renewed his first license, and used a similar name and address to obtain the second license. He also pointed to the five-year wait for a replacement license, and he asserted it was evidence the DMV put a hold on this license. Based on all the opportunities the DMV had to discover defendant's crimes, counsel argued, "any dumb dumb should be able to see that we've got the same licenses . . . ."

The prosecutor argued Parades' testimony established the DMV's inability to cross-reference information within its database when someone uses different names, addresses, and social security numbers. Thus the DMV did not have the ability to know defendant had multiple licenses until December 2010 when Berry contacted Paredes.

12

The court clarified that the issue was when a "law enforcement official as opposed to a rather opaque large government agency" discovered the violation, and denied the motion. Defendant argues error, but we disagree.

The denial of a section 1118.1 motion is reviewed de novo to determine whether the evidence is sufficient to support a conviction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1213.)

The statute of limitations for perjury is four years. (§§ 801.5, 803, subd. (c).) The statutory period is triggered when "either the 'victim' or responsible 'law enforcement personnel' learn of facts which, if investigated with reasonable diligence, would make that person aware a crime had occurred." (*People v. Moore* (2009) 176 Cal.App.4th 687, 692, italics deleted, quoting *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 330-331, disapproved on another ground in *People v. Whitmer* (2014) 59 Cal.4th 733, 742.)

For criminal discovery statutes, the term victim "extend[s] no further than those persons who are direct victims [of a crime] . . . and those persons who are clothed with a status imposed by law [such as a victim's] guardian, conservator or equivalent . . . .' [Citations.] (*People v. Moore* (2009) 176 Cal.App.4th 687, 692-693 (*Moore*).) The crucial determination is not the date on which the crime was actually discovered, but the date on which "law enforcement authorities or the victim had actual notice of circumstances sufficient to make them suspicious of [the offense,] thereby leading them to make inquiries which might have revealed the [offense]." (*People v. Zamora* (1976) 18 Cal.3d 538, 571-572; *People v. Wong* (2010) 186 Cal.App.4th 1433, 1444-1445.)

Here, Paredes testified the DMV lacked the ability to detect anyone who applied for more than one driver's license if they used different names, dates of birth, and social security numbers. Defendant asserts someone in the DMV must have had constructive knowledge of his two licenses because there was a five-year delay in

13

replacing his first license around the time his true address somehow became linked to his second license. However, he provides no evidence suggesting Paredes lied about the DMV's capabilities, nor does he persuade us anyone other than Paredes was "clothed with a status imposed by law." (*Moore, supra,* 176 Cal.App.4th at p. 693.) Apparently, there simply was no mechanism in place to detect individuals who, like defendant, apply for more than one driver's license using different names, addresses, and social security numbers. Thus, the court correctly denied defendant's section 1118.1 motion

### b. Jury Instruction

Defendant proposed a pinpoint instruction based on CALCRIM No. 3410, which read, in pertinent part, "A crime should have been discovered *when one or more people at the* [*DMV*] were aware of facts that would have alerted a reasonable diligent (person or law enforcement officer) in the same circumstances to the fact that a crime may have been committed." (Italics added.)

The prosecutor also proposed a pinpoint instruction based on CALCRIM No. 3410, which read, in pertinent part, "A crime should have been discovered when the victim/law enforcement officer was aware of facts that would have alerted a reasonabl[y] diligent victim/law enforcement in the same circumstances to the fact that a crime may have been committed."

During a discussion about these competing proposed pinpoint instructions, the prosecutor told the court he was relying on Berry's discovery of defendant's crime to toll the statute. He also mused that there was no victim in the classic sense. Defense counsel said the victim was the DMV and he was relying on circumstantial evidence to show it had constructive knowledge of his crimes as early as 2004.

The court ultimately instructed the jury without objection and without request for further modification as follows: "A crime should have been discovered when the victim or law enforcement officer . . . was aware of facts that would have alerted a

14

reasonably diligent victim or law enforcement officer . . . in the same circumstances to the fact that a crime may have been committed."

At oral argument, defendant conceded his proffered pinpoint instruction defined victim too broadly and was properly rejected. Even so, he asserts the pinpoint instruction actually given violated his constitutional rights. We disagree.

"""The general rule is that the trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence, even though not requested to do so, but need not instruct on its own motion on specific points developed at the trial." [Citation.]' [Citation.]" (*People v. Jenkins* (1994) 29 Cal.App.4th 287, 297.) Here, the pinpoint instruction given was correct and responsive to the evidence. Nothing more was required. If defendant wanted further modifications to focus on his version of the facts, he had to request them, and his failure to do so forfeits the issue on appeal. (*People v. Hardy* (1992) 2 Cal.4th 86, 153; *People v. Hillhouse* (2002) 27 Cal.4th 469, 503.)

In addition, based on the pinpoint instruction given, defendant argues the DMV was the victim and had constructive knowledge of his crimes as early as 2004. But the jury necessarily rejected this argument by finding the prosecution began within the statute of limitations. The jury apparently believed Paredes's testimony about the DMV's capabilities, and "it is not a proper appellate function to reassess the credibility of the witnesses." (*People v. Jones* (1990) 51 Cal.3d 294, 314-315.) And, in light of the overwhelming evidence neither the victim, nor law enforcement, discovered defendant's crimes earlier than October 2010, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

*c. Sufficiency of the Evidence*

Defendant argues there is insufficient evidence to support counts 2, 3, and 4, because failing to inform the DMV of his first license when he used his second license to obtain vehicle registration does not constitute perjury. Again, we disagree.

15

When addressing sufficiency of the evidence challenges, we evaluate the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319; *People v. Story* (2009) 45 Cal.4th 1282, 1296; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

Moreover, we accept any logical inferences the jury could have drawn from the circumstantial evidence because the jury, not the reviewing court, must be convinced of the defendant's guilt beyond a reasonable doubt. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) "If the circumstances, plus all the logical inferences the jury might have drawn from them, reasonably justify the jury's findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]" (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.)

"The elements of perjury are: 'a "willful statement, under oath, of any material matter which the witness knows to be false."'" (*People v. Garcia* (2006) 39 Cal.4th 1070, 1091; see § 118, subd. (a).) According to the information and verdict form, defendant "failed to disclose a false driver's license" on January 12, 2005 (count 4), December 29, 2007 (count 3), and on March 20, 2008 (count 2) when he applied for new car registration.

The court instructed the jury the People had the burden to prove beyond a reasonable doubt, "1. The defendant declared under penalty of perjury under circumstances in which such declaration was permitted by law;

"2. When the defendant declared, he willfully stated that the information was true even though he knew it was false;

"3. The information was material;

"4. The defendant knew he was making the statement under penalty of perjury;

"5. When the defendant made the false statement, he intended to declare falsely while under penalty of perjury;

"AND

"6. The defendant signed and delivered his declaration to someone else intending that it be circulated or published as true." (CALCRIM No. 2640.)

Defendant argues none of the vehicle registration forms required him to disclose the fact of his false driver's license. While technically correct, this is a distinction without a difference. The DMV vehicle registration form requires the affiant to state all the information provided was "true and correct." Here, defendant admitted he knowingly provided false information to obtain vehicle registration. This is perjury.

We also reject defendant's assertion the prosecutor's inclusion of the phrase "failure to disclose his false driver's license" in the information and verdict form alters the conclusion. The prosecutor clarified during closing argument the basis for counts 2, 3, and 4 were defendant's declarations under penalty of perjury that he provided "true and correct" information on the vehicle registration forms. The court's instructions also clarified that perjury could be found on evidence defendant "willfully stated that the information was true even though he knew it was false." There was no error.

17

## DISPOSITION

The judgment is affirmed.


                                        THOMPSON, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.